[No. G032062. Fourth Dist., Div. Three. June 29, 2004.]

DEFEND THE BAY, Plaintiff and Appellant, v.
CITY OF IRVINE et al., Defendant and Respondent;
THE IRVINE COMPANY, Real Party in Interest and Respondent.

**1264**

---

---

**COUNSEL**

Johnson & Cross, Kevin K. Johnson and Jared Phil Hanson for Plaintiff and Appellant.

Rutan & Tucker, Robert S. Bower and Jeffrey T. Melching for Defendant and Respondent.

Latham & Watkins, Christopher W. Garrett, Amy G. Nefouse and Daniel P. Brunton for Real Party in Interest and Respondent.

## OPINION

**BEDSWORTH, J.**—Defend the Bay appeals from a judgment that denied its petition for a peremptory writ of mandate to compel the City of Irvine (the City) to rescind its approval of an environmental impact report (EIR). It argues there is insufficient evidence to support conclusions regarding impacts in three areas—housing, agricultural resources, and biological resources. We disagree, and so affirm.

* * *

At issue is the City's plan for development of the Northern Sphere, a 7,743-acre site northeast of the former Marine Corps Air Station at El Toro. On June 4, 2002, the city council adopted a resolution certifying a final program EIR that authorized a General Plan amendment and zone change for the Northern Sphere. The instant writ petition followed.

The details of the EIR, and Defend the Bay's challenges, will be set out in the course of our discussion. Essentially, Defend the Bay alleges the City abused its discretion by not proceeding according to law, and further complains the City's decision is not supported by substantial evidence. The trial judge found the City had complied with the requirements of the California Environmental Quality Act (CEQA) (Pub. Res. Code § 21000 et seq.), and its actions were supported by the evidence.[1]

■ We review CEQA decisions to determine if they are supported by substantial evidence in the record as a whole (§ 21168), and whether the agency abused its discretion by failing to proceed in a manner required by law. In this case, as in most, those questions revolve around the EIR. (§ 21168.5.) "An EIR is an informational document which provides detailed information to the public and to responsible officials about significant environmental effects of a proposed project. [Citations.] It must contain substantial evidence on those effects and a reasonable range of alternatives, but the decision whether or not to approve a project is up to the agency. [Citations.]" *Goleta Union School Dist. v. Regents of University of California* (1995) 37 Cal.App.4th 1025, 1030 [44 Cal.Rptr.2d 110].) Review is confined to whether an EIR is sufficient as an informational document. "The court must uphold an EIR if there is any substantial evidence in the record to support the agency's decision that the EIR is adequate and complies with CEQA. [Citation.] [¶] CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive." (*Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 26 [82 Cal.Rptr.2d 398].)

---

[1] All subsequent statutory references are to the Public Resources Code unless otherwise indicated.

 As with all substantial evidence challenges, an appellant challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal. A reviewing court will not independently review the record to make up for appellant's failure to carry his burden. (*Markley v. City Council* (1982) 131 Cal.App.3d 656, 673 [182 Cal.Rptr. 659].)

I

Defend the Bay makes a series of arguments based on the EIR's estimate that the project will create more jobs than housing units—17,667 jobs and 12,350 housing units, for a jobs-to-housing ratio of 1.44. It regards that ratio as adverse, noting the City already has more jobs than housing (the ratio was 3.29 in 2000).

A

Defend the Bay first contends there is insufficient evidence to support the EIR's conclusion the project will not have a significant adverse impact on housing or employment growth. It reasons the ratio of 1.44 exacerbates the housing shortage, so it cannot be regarded as insignificant. A related argument is that the cumulative impact of the housing shortfall is even greater when other projects are considered, and again the EIR fails to acknowledge this adverse impact. We are not persuaded.

 In determining whether there are significant environmental impacts, the lead agency must consider direct, and reasonably foreseeable indirect, "physical changes in the environment." (CEQA Guidelines, Cal. Code Regs., tit. 14, ch. 3, § 15064 (d).)[2] A "significant effect on the environment" is one that has both a substantial and adverse impact on physical conditions within the area affected by the project. (Guidelines, § 15382.) If a project will create jobs and bring people into the area, the EIR must discuss the resulting housing needs, but not in minute detail. It is enough to identify the housing required and its probable location. (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 367, 370–371 [110 Cal.Rptr.2d 579].)

 An EIR must discuss cumulative impacts of a project when they are considerable. (Guidelines, § 15130 (a).) Cumulative impacts are defined as two or more effects which, considered together, are "considerable or which compound or increase other environmental impacts." (*Id.*, § 15355.) The

---

[2] The CEQA Guidelines (Guidelines), regulations adopted to implement CEQA, are codified at California Code of Regulations, title 14, chapter 3, sections 15000–15387.

cumulative impact from several projects is composed of the incremental environmental impact of the project at hand added to others that are closely related. "Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time." (*Id.*, § 15355 (b).)

Section 4.11 of the EIR deals with population and housing. It concludes the project impact on housing will be substantial but not adverse. The EIR explains the project will add low and moderate income housing, which is required by state "Fair-Share" housing law and a City affordable housing mandate. It will also add housing in "job-rich" Irvine and "contributes to a more balanced jobs/housing ratio." The calculus resulting in a conclusion the job/housing ratio will be improved is that with a current 3.29 figure, the 1.44 ratio for the project will bring down the City's overall ratio of jobs to housing. As to where the excess workers might be housed, the EIR explains: "The proposed project's employment component would . . . help balance considerable future housing growth slated for . . . south Orange County. [T]he south county areas are expected to remain housing rich through 2025, with a jobs/housing ratio of 1.05 [in one area] and 1.28 [in another]."

The EIR examines cumulative housing impacts of three different scenarios for development of other areas of the City. Taken together, the other proposed or planned development would also create more jobs than housing. So the cumulative impact of the Northern Sphere project is to push up the jobs-to-housing ratio. Apparently, without the Northern Sphere, the other projects have a ratio in the range of 7.5 to 8.2. Counting in the Northern Sphere, the combined figure for the proposed/planned projects drops to 3.8 to 4.0. The EIR concludes the cumulative housing impact is substantial but not adverse. The reasons give are the same as in the case of the Northern Sphere alone: "The proposed project's housing responds to city, regional, and state plans and policies which encourage more affordable housing, particularly in jobs-rich areas such as Irvine." The project also has a positive impact on the jobs-to-housing ratio.

■ The evidence supports the no-adverse-impact conclusion for the current project. Needed housing will be added, the city-wide imbalance of more jobs than housing will be ameliorated, and the shortfall in housing within the city will be made up by plentiful housing in adjacent communities. Whether we would agree that more jobs than housing is an adverse impact is not the question, and it is not our function to second-guess the City's decision. Rather, our role is to determine if the conclusion reached by the City has support in the record. It does.

Defend the Bay's view that a 1.44 jobs-to-housing ratio is adverse is a dissenting position. Implicit in this argument is the assumption that any

project that creates more jobs than housing has a significant adverse impact. But reasonable minds can differ about whether a lower jobs-to-housing ratio than that of the City ameliorates the problem or whether a ratio over .99 exacerbates it. That does not mean the City's conclusion lacks support in the record.

The same is true of the cumulative impacts, where the evidence also supports the conclusion of no adverse impact. There are benefits, the City decided they outweigh the detriments, and that is a choice it is entitled to make, within reason. So here, too, the EIR is sufficient.

B

Defend the Bay argues the project is inconsistent with the City's General Plan—a significant environmental impact which must be addressed in the EIR. But we cannot discern the claimed inconsistency.

Section 4.9 of the EIR deals with land use and planning impacts of the project. It considers whether the project is consistent with the land use elements of the City's General Plan. At issue is Objective A-4, entitled "Balanced Land Uses: Manage growth to ensure balanced residential and nonresidential development throughout the City." A detailed analysis is set out. The EIR concludes "the project provides a balanced set of land uses that addresses the housing, employment, circulation and open space objectives of Land Use Element Objective A-4."

Section 4.11 of the EIR (population and housing) lists the policies contained in the housing element of the General Plan. Policy C-1(e), "Balanced Land Use," includes this statement: "2000–2005 Objectives: Strive to improve the City's jobs-to-housing relationship, including matching type and price of housing to need generated by employment." There is also Objective C-8: "Balanced Employment/Residential Growth:" "Provide a range of housing opportunities to allow persons working in Irvine to also reside in the City."

Defend the Bay sees an inconsistency here because the project creates more jobs than housing and adds to the City's housing shortage. Thus, it says, there is no balance between jobs and housing. This is semantic manipulation. We are not dealing with assaying of minerals here. Balance does not require

equivalence, but rather a weighing of pros and cons to achieve an acceptable mix. The general plan requires the City to "strive to improve" the jobs-housing relationship. This project clearly does so. That Defend the Bay would strike a different balance than the City does not mean the project is inconsistent with the policies at issue. There is no significant environmental impact that would require discussion in the EIR.

## C

Finally, Defend the Bay argues the EIR's analysis of alternatives to the project, and the Statement of Overriding Considerations adopted by the City, are legally insufficient because neither recognizes the project will create a housing imbalance. We disagree. A housing "imbalance" already exists; this project ameliorates it. That might not satisfy Defend the Bay; it might not have satisfied another city council. But it satisfied this one, and their decision is within the law. No legal authority is cited, and it seems to us Defend the Bay is again asking that we arrogate to ourselves a policy decision which is properly the mandate of the City. We cannot.

## II

Defend the Bay also challenges two aspects of the project's impact on agricultural resources. First, it contends there is insufficient evidence to support the EIR's conclusion it is not feasible to mitigate the impact of developing 3,100 acres of agricultural land (out of the 7,743 acre project). Second, it argues the EIR fails to discuss the impact of amending a portion of the City's General Plan dealing with agriculture. Neither point is persuasive.

The EIR addresses agricultural resources in section 4.2. It states the conversion of 3,100 acres of prime farmland is a "significant unavoidable adverse impact." To mitigate this impact, both on-site and off-site retention of agriculture were considered, but rejected as infeasible.

■ Under CEQA, "feasible" means "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1) On-site agricultural use was considered infeasible in the long term for several reasons. To begin with, large scale agriculture will not be economically viable in the long run in Orange County, because of increasing land prices and environmental regulation, higher water and labor costs, higher property taxes, competition from other parts of the state and foreign countries, and growing

urbanization. In addition, reducing the development site "would impede the City from achieving its General Plan goals and objectives for housing and improving the existing jobs/housing imbalance in the City in a fiscally sound manner." The goals and objectives in question, according to the City Council's findings of fact approving the EIR, are "provision of sufficient housing units to meet the City's identified housing needs, improvement of the existing job/housing imbalance, preservation of areas for biological habitat and open space, and the need to achieve 'fiscal balance' as the City builds out."

Off-site mitigation was also found infeasible. The EIR explains there is no other comparable land planned for agriculture in the General Plan. Placing agricultural restrictions on new parcels is a possibility, but it would face the same problems as on-site mitigation—lack of economic viability and conflict with General Plan goals for housing, biological habitat/open space, and fiscal balance.

## A

Defend the Bay argues the conclusion that mitigation is not feasible is unsupportable. It contends the City's reasons for rejecting on-site mitigation are primarily economic—suggesting this is impermissible—and other reasons given by the City are wrong. As to off-site mitigation, Defend the Bay argues the City failed to consider the possibility of converting non-agricultural lands to agricultural use as a means of mitigating the present loss. We do not see it this way.

As to on-site mitigation, Defend the Bay's position is another instance of a policy disagreement with the City. But that does not vitiate the EIR's conclusions. Economic factors may be taken into consideration in determining what is feasible. (§ 21061.1.) So there is nothing impermissible in the City's finding that on-site agriculture is not feasible in the long term because it will not be economically viable.

Defend the Bay's main argument is the high value of the land does not make agriculture infeasible; water and labor costs, competition, and environmental regulation are irrelevant because the land is already in agricultural production; and urbanization has been caused by the City and the landowner. We note the first is an opinion, the second says nothing about the future prospects for large scale agriculture, and the third, encroaching urbanization, is a fact regardless of its cause. At bottom, this is another area where Defend

the Bay disagrees with the City, a reasonable and principled position, but not one which in any way demonstrates a lack of evidentiary support for the City's conclusions.[3]

Defend the Bay also assails the EIR's finding that on-site mitigation would prevent the City from improving its housing imbalance. The EIR's reasoning is that retaining on-site agriculture would mean fewer new housing units, which otherwise would bring down the city wide jobs-to-housing ratio. Defend the Bay's position here, as in the case of housing impacts, is simply that the entire project exacerbates the housing imbalance rather than reducing it, because it adds more jobs than housing. As we have said, while that is one way to view the project, it is not the only way, and it does not mean the City's finding lacks support in the record. Since we conclude the reasons set out in section 4.2 of the EIR support the conclusion that on-site mitigation is not feasible, we do not consider Defend the Bay's additional arguments that reasons given in other parts of the EIR are insufficient.

With respect to off-site mitigation, Defend the Bay argues it is irrelevant that no suitable land within the city is currently planned for agriculture. It contends land could be sought elsewhere within the city's sphere of influence or the county, and such land need not now be zoned for agriculture. Again, we are not convinced.

This argument ignores the fact the City also rejected off-site mitigation because any new agricultural uses would face the same problems as on-site mitigation: the negative economics of long-term agriculture, and the conflict between agriculture and the General Plan. That is sufficient evidence to support the conclusion that off-site mitigation is not feasible.

Defend the Bay points out the City did preserve 300 acres of off-site land in various locations for "metro-farming." This, it contends, demonstrates that off-site mitigation is possible, although the 300 acres is insignificant and insufficient. But the economic viability of small patches of farming in

---

[3] A related point is that the absence of agricultural tax abatements on the land does not make agriculture uses uneconomical, since prior abatements were given up by the landowner in anticipation of development. Even if true, a point on which we express no opinion, there is ample other evidence to support the conclusions regarding on-site mitigation.

The environmental organization contends this court previously held the financial benefits of development do not render agricultural uses infeasible, but that is a misrepresentation. The supporting citation is to the superior court minute order below, denying the instant writ petition. That is not a decision of this court, nor is it of any precedential value.

scattered locations says nothing about the prospects for the long-term, large scale endeavors Defend the Bay would like to see, so this fact does not make its case,[4] and we can find no others that do.

### B

Defend the Bay contends the EIR fails to discuss adequately the impact of amending Objective L-10 of the General Plan. This, it says, deprived the public of the opportunity to review and comment on the proposed amendment, which amounts to a failure to proceed in a manner required by law. We think not.

Objective L-10 deals with agriculture. The prior version read as follows: "Protect and preserve agriculture as a viable land use within areas designated agriculture . . . ." The amendment changes that to: "Encourage the maintenance of agriculture in undeveloped areas of the City until the time of development, and [] in areas not available for development."

The EIR discusses the proposed change in several places. In responses to comments received on the draft EIR, the final EIR discusses the proposed amendment of Objective L-10. Referring to an appendix that sets out the text of the old and new provisions, side by side, the response states the proposal makes two key changes: agriculture is no longer the sole appropriate land use, and emphasis is shifted from retention of agriculture as open space to retention of smaller-scale agricultural components for their heritage value.

Section 4.9 (Land Use and Planning) states that the General Plan provides, in Objective L-10, for protecting and preserving agriculture as a viable land use. It notes Policy (a) of Objective L-10 provides for maintenance of agriculture in areas so designated "until the time of development." (Italics added.) It continues: "The project would result in the conversion of approximately 3,100 acres of Prime Farmland, Farmland of Statewide Importance, and Unique Farmland to non-agricultural uses. . . ." The discussion concludes "the City must now establish . . . what its future commitment to agricultural uses will be. The General Plan amendment that is part of the project will accomplish these necessary revisions to Objective L-10."

---

[4] The City moves for judicial notice of a judgment in a case involving a different project, arguing the judgment approved the same mitigation measures adopted here. The judgment states, among other things, that "[t]he City's measures for preservation of agricultural land in other areas of the City, including the Agricultural Legacy Program, are found to be sufficient by this Court." The motion is unopposed, and it is granted. That said, we hasten to add that the relevance of the judgment in question is not clear, since we are not told if the "Agricultural Legacy Program" is the same one Defend the Bay assails, nor why satisfaction of requirements on another project bears on this one.

Defend the Bay faults this analysis as "buried" in the wrong section of the EIR (Land Use and Planning rather than Agricultural Resources), and it argues the analysis fails to give any details or consider the "fundamental nature of the policy shift" involved. Neither point is convincing. The wrong place argument, unsupported by any authority, is trivial in this context. The relevant inquiry is what is said. The details of the amendment *are* set out, and the nature of the proposed change is made clear in language that leaves little doubt of the magnitude and significance of the change. No authority is cited for the suggestion that "fundamental policy shifts" require more, and we see no reason to create such authority. It may be that there will be instances in which the placement of an analysis, combined with minimizing or obfuscating language, might vitiate its effectiveness, but this is most definitely not that case. The discussion of the amendment to Objective L-10 is prominent and frank.

■ A related argument is that the discussion in question first appeared in the final EIR, after the public comment period closed, so there was no opportunity for public evaluation and opposition. This, too, is wide of the mark. The inclusion of new material in a final EIR is not fatal, since the final version must respond to comments on the draft EIR, with the result that "the final EIR will almost always contain information not included in the draft EIR." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1124 [26 Cal.Rptr.2d 231, 864 P.2d 502].) What matters is whether "significant new information" is added after the public comment period closes. If so, the final EIR must be recirculated for public comment. (§ 21092.1; *Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 6 Cal.4th at p. 1129–1130.) Here, there is no claim the additions to the final EIR amounted to significant new information. The net result is that challenges to the project's impact on agricultural resources are of no avail.

### III

The final issue concerns impacts on biological resources. Defend the Bay argues the EIR improperly defers mitigation of significant impacts to three species, so the conclusion of "no significant impact on biological resources" is not supported by the record. We do not see it that way.

■ Any project that substantially reduces the habitat of a wildlife species, or reduces the number or range of an endangered, rare or threatened species,

is deemed to have a significant impact on the environment as a matter of law. (Guidelines, § 15065 (a).) For these purposes, species include both animals and plants. (Guidelines, § 15380 (a).)

In addition, a regional conservation plan that includes the City of Irvine and Orange County imposes further requirements. Pursuant to the Natural Community Conservation Planning Act (Fish & G. Code, § 2800 et seq.), the Natural Communities Conservation Plan and Habitat Conservation Plan (NCCP/HCP) was adopted. It provides, among other things, that if "conditionally covered" species will be affected by a project, the United States Fish and Wildlife Service (USFWS) and the California Department of Fish and Game (CDFG) must be consulted, and a specific mitigation plan must be developed that satisfies the NCCP/HCP. Where species not conditionally covered are impacted, a permit must be obtained from the USFWS.

At issue are the Least Bell's Vireo (a bird), the Foothill Mariposa Lily, and the Western Spadefoot Toad. The vireo is an endangered species and conditionally covered, the lily is conditionally covered, and the toad is a "sensitive" species that apparently required evaluation. The EIR concludes that with proposed mitigation measures, the biological impacts of the project will be reduced to a level of insignificance.

According to the EIR, the Least Bell's Vireo habitat would be impacted by the project. The required mitigation turns on classification of that habitat. If the habitat is an area of "lesser long term conservation value," a special mitigation plan must be adopted in consultation with USFWS and CDFG. On the other hand, if the area has "long term conservation value," a permit is required from USFWS, absent which the impact on the bird would be significant. According to the EIR, the available data puts the area in the lesser conservation value category, but final determination is to be made by USFWS and CDFG.

Mitigation measures are provided. Prior to the approval of a tentative tract map, the landowner must: consult with the USFWS and CDFG; conduct surveys during the breeding season to determine if the birds are in fact present in the habitat area; obtain a determination regarding the long-term value of the habitat area; obtain permits from the USFWS and CDFG; and coordinate avoidance measures with those agencies in ways that are required to include seven listed items.

Two colonies of the Foothill Mariposa Lily would be affected by the project, consisting of 28 individual plants. The EIR states the City is required to mitigate this impact under the NCCP/HCP, and it describes the latter's requirements: (1) design modifications that minimize impact to the habitat; (2) conduct "an evaluation of salvage, restoration, []enhancement, [] management of other conserved mariposa lily, or other mitigation techniques . . . to offset impacts;" (3) provide monitoring and management "consistent with Chapter 5 of the NCCP/HCP;" and (4) coordinate with USFWS and CDFG, and obtain USFWS approval. However, the actual mitigation plan is not set out in the EIR.

The EIR reports the Western Spadefoot Toad was not found in the project area, but there is suitable habitat that would support the creature, so surveys must be conducted in potential breeding pools prior to issuing grading permits. If the toad is found in the project area, a mitigation plan must be prepared in consultation with USFWS and CDFG. It is to include the construction of breeding pools satisfactory to these agencies on nearby protected lands. Since there are existing populations of the toad within the regional conservation area covered by the NCCP/HCP, the EIR concludes any impact on this animal would be less than significant.[5]

## A

■ Defend the Bay first argues the failure to obtain a determination of the long-term conservation value of the vireo's habitat constitutes improper deferral of mitigation. Deferral of the specifics of mitigation is permissible where the local entity commits itself to mitigation and lists the alternatives to be considered, analyzed and possibly incorporated in the mitigation plan. (*Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1028–1030 [280 Cal.Rptr. 478].) On the other hand, an agency goes too far when it simply requires a project applicant to obtain a biological report and then comply with any recommendations that may be made in the report. (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1396–1397 [43 Cal.Rptr.2d 170].)

As explained in *Sacramento Old City Assn. v. City Council, supra,* 229 Cal.App.3d 1011, " 'for [the] kinds of impacts for which mitigation is known to be feasible, but where practical considerations prohibit devising such

---

[5] The Irvine Company requests that we take judicial notice of the fact its environmental consultant conducted surveys for the Western Spadefoot Toad during the spring of 2003, found none, and the City accepted the consultant's report as complying with the mitigation measures for that animal. Defend the Bay opposes the motion, arguing the documents are not relevant since they were not part of the record upon which the EIR was approved. We agree, and deny the Irvine Company's motion for judicial notice.

measures early in the planning process (e.g., at the general plan amendment or rezone stage), the agency can commit itself to eventually devising measures that will satisfy specific performance criteria articulated at the time of project approval. Where future action to carry a project forward is contingent on devising means to satisfy such criteria, the agency should be able to rely on its commitment as evidence that significant impacts will in fact be mitigated. [Citations.]' " (*Id.* at pp. 1028–1029.)

On this basis, we find there is no improper deferral of mitigation regarding the Least Bell's Vireo. Regardless of which category the habitat falls into, prior to approval of a tentative tract map, the developer is required to consult with the USFWS and CDFG, obtain permits, and adopt seven itemized avoidance measures in coordination with the aforementioned agencies. The EIR was prepared at the beginning of the planning process, for a General Plan amendment and zoning change, the City has committed to mitigation, and it has specified the criteria to be met. That is sufficient at this early stage of the planning process. (*Sacramento Old City Assn. v. City Council, supra,* 229 Cal.App.3d at pp. 1028–1030.) The record supports the conclusion that impacts to the vireo, after mitigation, will be insignificant.

B

Defend the Bay contends the EIR does not mitigate significant adverse impacts to the Foothill Mariposa Lily because no mitigation plan is set out or approved, and future mitigation is inadequate. Here again, however, while there is deferred mitigation, it is not improper. The City is required to mitigate impacts to the lily under the NCCP/HCP, the EIR commits the City to such mitigation, and it lists what will be required in the mitigation plan. That is enough. (*Sacramento Old City Assn. v. City Council, supra,* 229 Cal.App.3d at pp. 1028–1030.)

The only case cited by Defend the Bay on this point is distinguishable. *Citizens for Quality Growth v. City of Mt. Shasta* (1988) 198 Cal.App.3d 433, 442, fn. 8 [243 Cal.Rptr. 727], held certification of an EIR was invalid because the city council did not make any findings adopting the mitigation measures set out in the EIR. But here, there is no claim that the City failed to make the findings necessary to properly adopt the present EIR, so we cannot see the relevance of the case cited. The record adequately supports the EIR's conclusion that impacts to the lily will be insignificant after mitigation.

C

Finally, the challenge regarding the Western Spadefoot Toad is that no timetable has been set for the surveys to search for the animal, and there is no

attempt to avoid impacts where feasible. Defend the Bay again argues this is improper deferral of mitigation.

But the City has committed to mitigation if the toad is found in the project area, and it has a plan—to build satisfactory breeding pools on nearby protected land. That is sufficient. As for the timetable issue, the EIR requires the surveys to be undertaken prior to issuing any grading permits. In effect, that is a timetable, and no reason is suggested why it is inadequate, so this argument goes nowhere.

Two other arguments regarding the toad are no more persuasive. Defend the Bay contends the EIR was required to find the project impact on the creature significant because it is an "endangered, rare or threatened species." (Guidelines, § 15065.) But it does not point to any evidence of this designation. To the contrary, the record characterizes the toad as a "sensitive" species and a California species of "special concern" and there is no suggestion that is the same thing. We assume the different labels were attached for a reason and Defend the Bay does not address the issue.

The environmental organization also argues the City violated a rule that comments from sister agencies must be responded to with a good faith, reasoned analysis. (*Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344, 1367 [111 Cal.Rptr.2d 598].) It says the EIR ignored recommendations from the USFWS and CDGF that impacts to the toad be avoided and unavoidable impacts be mitigated. But we do not find any evidence of this. The agencies did make those recommendations. But to implement them, all they suggested was that surveys of breeding habitat be conducted during the breeding season, and impacts to breeding pools be mitigated be creating comparable new ones in coordination with the agencies. The EIR adopts both suggestions—the surveys must be conducted during the breeding season, and if the toad is found, new breeding pools must be constructed, satisfactory to the agencies in question. So there is nothing amiss here.

In fine, no grounds have been shown that would require us to issue a writ of mandate to direct the City to rescind approval of the EIR for the Northern

Sphere project. Accordingly, the judgment appealed from is affirmed. Respondent is entitled to costs on appeal.[6]

Sills, P. J., and Rylaarsdam, J., concurred.

---

[6] After oral argument, the parties filed a stipulation to dismiss the appeal. Dismissal is discretionary once the record on appeal has been filed (Cal. Rules of Court, rule 20(c)(2)), and the court has inherent power to retain a matter that presents important issues of continuing interest, even though technically moot. (*City of Morgan Hill v. Brown* (1999) 71 Cal.App.4th 1114, 1121, fn. 5 [84 Cal.Rptr.2d 361].) We deem this such a case. The significance of the jobs/housing ratio of a project appears to be a novel issue. Whether a public entity can approve a development project that creates more jobs than housing is a matter of public interest and likely to recur.

We are also troubled by the parties' refusal to reveal the terms of the settlement. We invited them to submit letter briefs on whether this appeal involves important issues of continuing interest. Our order directed any party responding to attach a copy of the settlement documents to its brief. Defend the Bay did not respond. The other parties did. No one provided the settlement documents.

According to The Irvine Company, the settlement agreement is confidential; and Defend the Bay refused to consent to disclosure. The City claims it is not a party to the settlement, which did not require it to change the "land use approvals" for the project. But that is misleading. The City's letter brief reveals it did change the project, two months after oral argument. At the request of The Irvine Company, the City converted 227 acres of the project from medical/science to residential use by amending the general plan and making a zoning change. The net effect was to reduce the jobs/housing ratio to less than the one-to-one ratio sought by Defend the Bay.

Under these circumstances, we are unable to determine the nature of the settlement and confronted with important issues we expect to be of continuing importance, we conclude decision of the case is required.