Filed 9/15/17; Certified for Publication 10/16/17 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PLACERVILLE HISTORIC PRESERVATION LEAGUE,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>JUDICIAL COUNCIL OF CALIFORNIA,<br><br>      Defendant and Respondent;<br><br>COUNTY OF EL DORADO, et al.<br><br>      Real Parties in Interest and Respondents. | A149501<br><br>(San Francisco County<br>Super. Ct. No. CPF-15-514387) |

In this mandamus proceeding, plaintiff Placerville Historic Preservation League (League) challenged the certification of an environmental impact report prepared by defendant Judicial Council of California (Judicial Council) in connection with the relocation of courthouse operations in the City of Placerville (City). The project considered in the EIR would consolidate trial court operations from two buildings, one of which is a historic building in downtown Placerville, into a single new building on the outskirts of the City. Although the draft EIR addressed the possible economic impact of moving judicial activities from the downtown courthouse, it concluded the impact was not likely to be severe enough to cause urban decay in downtown Placerville. In their mandamus action, the League contended this conclusion was not supported by substantial

1

evidence, given the importance of the courthouse to downtown commerce. The trial court rejected the argument, and we affirm.

## BACKGROUND

The Trial Court Facilities Act of 2002 shifted responsibility for California trial court facilities from individual counties to the state Judicial Council. (Stats. 2002, ch. 1082, § 4, p. 6976; Gov. Code, § 70321.) As part of the transfer, the Legislature created the State Court Facilities Construction Fund, to be used for the "alteration, renovation, and construction" of county courthouses, and directed the Judicial Council to establish priorities for construction and recommend projects to the Legislature. (Gov. Code, §§ 70371, 70376, 70391, subds. (l)(2), (3).)

One of the projects ultimately pursued was the replacement of the El Dorado County courthouse. El Dorado County (County) is largely rural, stretching from the central Sierra Nevada foothills in the west to the state's eastern border, including the south shore of Lake Tahoe. The County's court facilities are located in the City, 45 miles northeast of Sacramento and with a population of just over 10,000.[1] Judicial activities in the County are currently divided between four courtrooms in the Main Street Courthouse, a historic downtown building dating from 1912 and renovated in 1971, and two courtrooms located in a County administrative complex. The Judicial Council plan would consolidate all court activities in a new three-story building to be built on undeveloped land adjacent to the County jail, located less than 2 miles from the city center of Placerville.[2]

In October 2014, the Judicial Council issued a draft EIR for the project, which was largely concerned with the environmental and traffic impacts of the new construction

---

[1] We take judicial notice of these geographic and demographic facts from the official website of El Dorado County, at www.edcgov.us/Government/Pages/About_Us.aspx.

[2] The draft EIR is vague about the exact distance between downtown and the location of the new courthouse, but the parties appear to accept that the distance is less than two miles.

2

necessitated by the project. With respect to the Main Street Courthouse, which would be retired as a courthouse, the Judicial Council noted it qualified as a "historical resource" for purposes of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA). As such, any material impairment of the building would constitute a "substantial adverse change" in the environment. (Pub. Resources Code, § 21084.1; CEQA Guidelines, § 15064.5.)[3] In order to prevent loss of this historic resource, the draft EIR stated, the Judicial Council had "worked extensively with the city and the county to identify a disposition process that would best preserve the courthouse. In September 2014, both the City Council of Placerville and the El Dorado County Board of Supervisors directed their staff to work together to explore potential re-use options for the courthouse. Both the city and the county, in an effort to facilitate as much community input as possible, established a committee to explore the potential for the re-use and repurposing of the historic Main Street Courthouse."[4] To avoid a material impairment of the building, the draft EIR required as a mitigation measure that any new use for the building comply with the "Secretary of the Interior's Standards for Rehabilitation," which "call for the retention of significant, character-defining features of the building while finding a new use for the structure that is compatible with its historic character."

The draft EIR also acknowledged that the withdrawal of judicial activities from the centrally located Main Street Courthouse could have an impact on downtown Placerville. Citing *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184 (*Bakersfield*), the draft EIR recognized that it was required to

---

[3] The regulations governing compliance with CEQA, commonly known as the "CEQA Guidelines," are published at California Code of Regulations, title 14, section 15000 et seq. We will cite individual CEQA Guidelines in the form "Guidelines, § xxxxx."

[4] Shortly before the draft EIR was issued, the City Council had begun to implement this plan by taking applications for a "Blue Ribbon Committee" to "explore reuse options for the Historic Main Street Courthouse." To assist the new committee, in March 2015 the Judicial Council issued a request for proposals regarding a "Re-Use Strategy" for the courthouse.

address neighborhood deterioration as a significant environmental effect of the project if it was reasonably foreseeable the project would cause "urban decay." This was defined as follows: "[N]ot simply a condition in which buildings become vacant as businesses compete with each other in the normal course of the market-based economy, nor is it a condition where a building may be vacated by one business or use and reused by a different business or for alternative purposes. Rather, under CEQA 'urban decay' is defined as physical deterioration of properties or structures that is so prevalent, substantial, and lasting a significant period of time that it impairs the proper utilization of the properties and structures, and the health, safety, and welfare of the surrounding community. Physical deterioration includes abnormally high business vacancies, abandoned buildings, boarded doors and windows, parked trucks and long-term unauthorized use of the properties and parking lots, extensive or offensive graffiti painted on buildings, dumping of refuse or overturned dumpsters on properties, dead trees and shrubbery, and uncontrolled weed growth or homeless encampments."[5]

The Judicial Council concluded that urban decay, as so defined, was not a reasonably foreseeable consequence of the project. The draft EIR reasoned that "blight within the historic Main Street area of Placerville" was unlikely to occur from the retirement of the Main Street Courthouse because (1) the City and County both were committed to finding a new use for the building that would, in effect, replace the economic contribution of the courthouse to the downtown area, and (2) there were "numerous retail, commercial, and office uses independent of the courthouse operations."[6] As the draft EIR concluded, "Based on the city and county's commitment

---

[5] This definition of "urban decay" was taken from, and approved in, *Joshua Tree Downtown Business Alliance v. County of San Bernardino* (2016) 1 Cal.App.5th 677, 685 (*Joshua Tree*). Both parties appear to accept that the definition constitutes an appropriate standard for measuring urban decay under CEQA.

[6] The League contends there was no evidence to support this statement, but the argument misunderstands the EIR process. There is no requirement of an evidentiary hearing prior to the issuance of a draft EIR. (*Citizens Opposing a Dangerous Environment v. County of Kern* (2014) 228 Cal.App.4th 360, 381 & fn. 18 ["While public

4

to re-use the facility, as well as the fact that a number of businesses on Main Street are not dependent on the historic courthouse, discontinuation of the courthouse use would not be expected to result in a significant impact to the downtown area leading to a blighted downtown." As to the relocation of courtroom functions from the County administrative building, the draft EIR concluded no urban decay would result because the vacated space would be filled by other County activities.

At least one commenter on the draft EIR was concerned with the impact on the economy of downtown Placerville. Kirk Smith, an owner of property located on Main Street, believed that ending judicial functions in the Main Street Courthouse "would create an absolutely horrendous blight to Placerville's Main Street, all but turning this historic community into a ghost town given the economic dependency of local merchants on the courthouse for their livelihoods." In an "informal poll" of local merchants, Smith was told that from 5 percent to 20 percent of the commerce of the responding businesses resulted from courthouse activities. Among the affected businesses specifically mentioned by Smith were "not just restaurants and bars," but also a news stand and hardware store. One restaurant owner believed that ending judicial activities in the courthouse would put him out of business. Smith noted that no economic study had been performed with respect to the economic impact of the proposed project and expressed concern that the City and County would lack the resources to keep the courthouse open.[7]

Following the close of the comment period on the draft EIR, a group of local businesspersons relayed further concerns about the economic impact of the withdrawal of

hearings are encouraged, they are not required at any stage of the EIR process"].) Rather, the lead agency investigates the relevant circumstances in the process of preparing the draft EIR, and the information gathered in the course of this investigation is evidence on which the lead agency can rely in reaching conclusions in the EIR. (See *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 663 & fn. 6.)

[7] In an e-mail submitted to the Judicial Council after the close of the comment period, Smith stated that the range of business dependence upon the courthouse was 5 percent to 30 percent, and he claimed "most" businesses fell within this range. The basis for these claims was not stated.

judicial activities from the Main Street Courthouse and asked the Judicial Council to consider the construction of an annex to the building. A petition to this effect signed by some 60 persons was submitted.[8] One communication disclosed that 38 businesses had closed in the downtown area in the prior 3 years. Another estimated that between 150 and 200 persons visited the courthouse on a typical day, spending between $1,500 and $3,000 at nearby businesses. For the approximately 65 businesses on Main Street, the commenter opined, the business generated by courthouse employees and visitors "is the difference in a healthy downtown economy and 'urban blight.' " Because the site of the new courthouse was close to the western boundary of the city, this author believed, commerce resulting from courthouse visits would be diverted elsewhere than downtown. A third person noted that the courthouse had the effect of drawing County residents to downtown Placerville, exposing them to businesses they might not otherwise have visited. This commenter believed that "[l]oss of courthouse activity in the downtown area could potentially cause massive economic devastation for this community."

The Judicial Council noted these comments in a staff report recommending certification of the EIR. The report stated, "[b]oth economic and historic impacts were analyzed in the preparation of the EIR. Impacts with potential are noted in the EIR (historic) and were determined to be less-than-significant with mitigation. However, separate from the CEQA process, the Judicial Council is working with both the city and county to develop a re-use strategy for the building that will support the downtown businesses and local residents." In other words, the memorandum concluded the residents' comments did not require modification of the draft EIR's discussion of urban decay. The Judicial Council certified the Final EIR on June 10, 2015.

One month later, the League, a group of County citizens with "a particular interest in the protection of El Dorado County's environment," filed this petition for a writ of mandate vacating the Judicial Council's certification of the EIR. The petition alleged

---

[8] Although these comments were submitted after the close of the period for comment on the draft EIR, the Judicial Council elected to accept them, as do we. (Guidelines, § 15207 [lead agency has the discretion to respond to late comments].)

four deficiencies in the EIR, but only one of them, the failure to treat the potential for urban decay resulting from the relocation of courthouse operations from the Main Street Courthouse as a significant environmental effect of the project, was ultimately argued to the trial court.

The trial court rejected the argument and denied the petition in a thorough and well-reasoned written decision that hardly needs elaboration. The court reasoned that there was no evidence in the record to suggest that removing courthouse operations from downtown would lead to physical impacts on the downtown environment. As a result, "urban decay is not reasonably anticipated." To the contrary, the court agreed with the draft EIR that "there is every reason to believe the agencies will repurpose the building" to the ultimate benefit of the downtown area, and any impact from the intervening vacancy of the building was unlikely to result in physical decay of the downtown. Accordingly, the court concluded, there was no basis for contending that the EIR should have treated the risk of urban decay as a significant environmental effect of the project.

DISCUSSION

A. *Legal Background.*

"CEQA embodies a central state policy to require state and local governmental entities to perform their duties 'so that major consideration is given to preventing environmental damage.' [Citations.] [¶] CEQA prescribes how governmental decisions will be made when public entities, including the state itself, are charged with approving, funding—*or themselves undertaking*—a project with significant effects on the environment." (*Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677, 711-712 (*Eel River*).)

" 'The EIR has been aptly described as the "heart of CEQA." [Citations.] Its purpose is to inform the public and its responsible officials of the environmental consequences of their decision before they are made.' " (*Eel River*, *supra*, 3 Cal.5th at p. 713.) An EIR is " 'an informational document' " whose purpose " 'is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the

7

significant effects of such a project might be minimized; and to indicate alternatives to such a project.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391.) Accordingly, an EIR must identify and discuss the " ' "significant environmental effects" ' " of the proposed project (*North Coast Rivers Alliance v. Marin Municipal Water Dist.* (2013) 216 Cal.App.4th 614, 624 (*North Coast*)), which are defined as the "direct, and reasonably foreseeable indirect, 'physical changes in the environment.' [Citation.] A 'significant effect on the environment' is one that has both a substantial and adverse impact on physical conditions within the area affected by the project." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266, fn. omitted.)

Given its exclusive focus on environmental impacts, CEQA ordinarily does not require an EIR to address the economic and social effects of a proposed project. (Guidelines, § 15064, subd. (e); *Joshua Tree, supra,* 1 Cal.App.5th at p. 684.) When these effects are sufficient to cause a "physical change" in the environment, however, "the physical change may be regarded as a significant effect in the same manner as any other physical change resulting from the project." (Guidelines, § 15064, subd. (e).) At least since *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, it has been recognized that if the detrimental economic effects of a project are sufficient to cause "business closures and eventual physical deterioration" of a neighborhood, that physical deterioration must be assessed in the EIR. (*Id.* at pp. 169-170.) In *Bakersfield*, *supra*, 124 Cal.App.4th 1184, which involved the construction of "supercenter" stores, the court reviewed a series of decisions concerning the circumstances that require an EIR to address neighborhood deterioration and concluded, "proposed new shopping centers do not trigger a conclusive presumption of urban decay. However, when there is evidence suggesting that the economic and social effects caused by the proposed shopping center ultimately could result in urban decay or deterioration, then the lead agency is obligated to assess this indirect impact. Many factors are relevant, including the size of the project, the type of retailers and their market areas and the proximity of other retail shopping opportunities. The lead agency cannot

8

divest itself of its analytical and informational obligations by summarily dismissing the possibility of urban decay or deterioration as a 'social or economic effect' of the project." (*Id.* at p. 1207.)

"The standard of review applicable to an agency's decision under CEQA depends on the nature of the action being reviewed and when in the multi-tiered process it occurred." (*Sierra Club v. County of Sonoma* (2017) 11 Cal.App.5th 11, 23.) In general terms, we review an agency's compliance with CEQA for "prejudicial abuse of discretion," which exists if "the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (Pub. Resources Code, § 21168.5.) "Judicial review of these two types of error differs significantly: while we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' " (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435.) "The substantial evidence standard is applied to conclusions, findings and determinations. It also applies to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions." (*Bakersfield*, *supra*, 124 Cal.App.4th at p. 1198.)

B.      *Urban Decay as a Significant Environmental Impact of the Project*.

The League contends that the Judicial Council erred in concluding that urban decay was not a reasonably foreseeable indirect effect of the project. Because this is essentially a factual question, we apply the substantial evidence standard of review to the Judicial Council's conclusion. (E.g., *North Coast, supra,* 216 Cal.App.4th at p. 637 [the adequacy of an EIR's discussion of an impact is reviewed for substantial evidence].)

9

Substantial evidence supports the Judicial Council's conclusion that the type of physical deterioration embodied in the term "urban decay" is not a reasonably foreseeable consequence of withdrawing judicial functions from the Main Street Courthouse and relocating them to a new building outside the downtown district. Initially, there is no reason to *presume* that urban decay would be a consequence of the project. As defined by CEQA, urban decay is a relatively extreme economic condition. In a dynamic urban environment, including that of a small city such as Placerville, change is commonplace. In the absence of larger economic forces, urban decay is not the ordinary result. On the contrary, businesses and other activities come and go for reasons of their own, without necessarily affecting the overall health of the economy. As noted above, one commenter told the Judicial Council that 38 businesses had closed in the downtown area in the past 3 years. This suggests the district possesses the economic vitality to tolerate significant turnover without suffering the type of physical deterioration characteristic of urban decay.

Nor was there evidence to suggest that the economic contribution of the Main Street Courthouse was critical to the health of downtown Placerville. There is no doubt that judicial activities in the courthouse, particularly the presence of court employees and lawyers and the periodic assembly of jurors, contribute to the economy of downtown Placerville. As the League states, "Jurors and employees [of the courthouse] frequently spend their lunches and downtime walking and browsing downtown businesses and eating at the local restaurants." There is no evidence, however, that these activities are of such importance to the downtown that their relocation will result in the type of economic loss necessary to cause urban decay. As the draft EIR reasoned, many businesses in the downtown area are independent of the courthouse's activities.

Finally, any dislocation caused by the elimination of judicial activities in the Main Street Courthouse is likely to be temporary. As the draft EIR explained, officials of both the City and County view the Main Street Courthouse as important to the downtown and are committed to finding an appropriate new use for the historic building, and the Judicial Council is working to assist those efforts. Given this commitment, there is every reason

10

to believe that, after a period of transition, the building will resume its role as a source of downtown commerce.[9]  In other words, there was no evidence that the changes attendant upon the project will result in a long-term detriment to downtown Placerville, let alone constitute the type of catastrophe necessary to cause urban decay.

The League contends the Judicial Council's reliance on the likely re-use of the Main Street Courthouse was improper because it was not adopted as a mitigation measure.  This is not an entirely fair representation of the record.  As discussed above, re-use of the building in a manner that would not impair its value as a historical resource *was* adopted as a mitigation measure.  Yet apart from this, the League's argument puts the cart before the horse.  The question before the Judicial Council was whether, under the circumstances presented in downtown Placerville, urban decay was a reasonably foreseeable consequence of the relocation of judicial activities.  One of those circumstances was the commitment of the City and the County to find a new use for the courthouse and the consequent likelihood that such a new use would be found.  Based in part on that likelihood, the draft EIR concluded that urban decay was not reasonably foreseeable and therefore was not a significant indirect environmental effect for purposes of CEQA.  Because there was no significant impact to mitigate, there was no occasion, and no legal basis, for adopting courthouse re-use as a mitigation measure.  The League fails to cite any prior decision holding that a lead agency must adopt as a mitigation measure the circumstances that make an impact not reasonably foreseeable, as a condition of concluding that the impact is not significant.

The League also characterizes the likelihood of re-use as an "unenforceable and illusory 'commitment,' " but the lack of a binding requirement for re-use does not undercut the reasoning of the draft EIR.  The issue before the Judicial Council was

---

[9] As the trial court's decision explored at length, City and County policies, including the county general plan, recognize the importance of Placerville and its historic downtown and favor its development and promotion.  This pre-existing commitment to Placerville bolsters confidence that both entities will find a meaningful new use for the courthouse, rather than permitting it to fall into disuse and disrepair.

whether the occurrence of urban decay was "reasonably foreseeable," not whether its non-occurrence was a certainty. One reason the EIR concluded urban decay was not reasonably foreseeable was the likely replacement of judicial activities in the courthouse building by other uses. While this re-use was by no means *guaranteed*, it was likely because it would be a benefit to the City and public officials were committed to realizing that benefit. This well-grounded probability is sufficient to support the Judicial Council's conclusion that urban decay is not reasonably foreseeable.

The League also points to the evidence contained in the comments submitted by local residents with respect to the impact of relocation. While these comments provide credible grounds for concern that relocation will constitute a hardship for some local businesses, this is an insufficient basis to support a conclusion that relocation threatens urban decay. The most persuasive evidence was Smith's informal survey, in which some of the respondents claimed to derive from 5 percent to 20 percent of their business from courthouse activities. However, without further information about the nature of the survey, including the manner in which participants were selected and the proportion of businesses participating, as well as the number responding that there would be no effect on their businesses, this is little more than anecdotal evidence. It suggests that some businesses will lose revenue, but it does not provide a sufficient basis to infer the long-term detriment necessary to result in physical deterioration. The other comments provided less actual information. While these comments reflected the opinions of a small number of local merchants, those opinions do not constitute actual evidence of the possibility of urban decay because they were not based on any objective study of the economic conditions prevailing in the downtown area. (See Pub. Resources Code, § 21082.2, subd. (c) ["Argument, speculation, unsubstantiated opinion or narrative, evidence . . . or evidence of social or economic impacts which do not contribute to, or are not caused by, physical impacts on the environment, is not substantial evidence"]; see *Joshua Tree*, *supra*, 1 Cal.App.5th at pp. 690-691.)

The League relies heavily on *Bakersfield*, but in that case there was substantial, competent evidence of a risk of urban decay from implementing two projects under

12

consideration, a pair of retail shopping centers, each featuring a 220,000-square-foot Wal-Mart discount and grocery store as its anchor tenant. (124 Cal.App.4th at p. 1194.) Unlike the draft EIR here, neither EIR in *Bakersfield* addressed the economic impact of the construction of these shopping centers on the city, nor did either contain a statement explaining "why it had been determined that urban decay was not a significant effect of the proposed projects." (*Id.* at p. 1208.) The issue before the court was therefore not whether, as here, the lead agency lacked substantial evidence to support its conclusion that urban decay was not a reasonably probable result of the project, but whether the lead agency erred in disregarding the risk of urban decay altogether. More importantly, as the court noted, there was "a great deal of evidence . . . supporting the validity of concerns that the shopping centers could cause a ripple of store closures and consequent long-term vacancies that would eventually result in general deterioration and decay within and outside the market area of the two shopping centers." (*Id.* at p. 1208.) This included an economic study commissioned by the petitioners from a professor of economics, which contained a detailed analysis of the economic conditions prevailing in the general area of the new shopping centers and identified some 29 businesses "that are at direct risk of closure" as a consequence of the new Supercenters, as well as four existing shopping centers that would be adversely affected. (*Id.* at p. 1209.) In addition, the petitioner had submitted "numerous studies and articles" analyzing the adverse effects of "super-sized retailers" in other communities. (*Id.* at p. 1210.) Further, "numerous individuals" submitted comments relating to the risk of urban decay, which the court described. (*Id.* at pp. 1210-1211.) There is nothing similar in the present administrative record.

Attempting to turn this lack of information to its advantage, the League argues the Judicial Council's finding was not supported by substantial evidence precisely because no economic study of the impact of relocation was performed. In any endeavor of this type, financial resources are limited, and the lead agency has the discretion to direct those resources toward the most pressing concerns. " 'A project opponent or reviewing court can always imagine some additional study or analysis that might provide helpful information. It is not for them to design the EIR. That further study . . . might be helpful

does not make it necessary.' " (*North Coast*, *supra*, 216 Cal.App.4th at p. 640.) " 'In exercising its discretion, a lead agency must necessarily make a policy decision in distinguishing between substantial and insubstantial adverse environmental impacts based, in part, on the setting. [Citation.] Where the agency determines that a project impact is insignificant, an EIR need only contain a brief statement addressing the reasons for that conclusion.' " (*Id.* at p. 625.) As discussed above, there was no reason to presume urban decay from the relocation of judicial activities from the Main Street Courthouse, and the factors cited by the draft EIR—the likelihood of a new use for the courthouse and the existence of businesses not reliant on current courthouse activities— suggest that urban decay is not a reasonably foreseeable consequence. Given these circumstances, there was no requirement that the Judicial Council perform an economic study to confirm the lack of a significant impact.

It is important to note that much of the case law in this area has developed in circumstances similar to those in *Bakersfield*, in which the city authorized the construction of two enormous stores that could make superfluous a range of smaller stores and thereby create a risk of widespread business failures. That is not the situation here. The Judicial Council proposes to relocate certain governmental functions that, as a by-product of their presence, produced some commercial activity. Unlike the circumstances in *Bakersfield*, the new construction will not result in a competitor to siphon business from downtown. Just as important, the relocation will leave behind a building that can be filled with other activities producing a level of commerce similar to that removed by the relocation, thereby mitigating the impact of the relocation. These factors provide substantial evidence to support the draft EIR's conclusion that urban decay is not a reasonably foreseeable consequence of the project.

DISPOSITION

The judgment of the trial court is affirmed.

14

_____
Miller, J.

We concur:


_____
Richman, Acting P.J.


_____
Stewart, J.

Filed 10/16/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PLACERVILLE HISTORIC PRESERVATION LEAGUE,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>JUDICIAL COUNCIL OF CALIFORNIA,<br><br>      Defendant and Respondent;<br><br>COUNTY OF EL DORADO, et al.<br><br>      Real Parties in Interest and Respondents. | A149501<br><br>(San Francisco County<br>Super. Ct. No. CPF-15-514387) |

BY THE COURT:

The opinion in the above-entitled matter filed on September 15, 2017, was not certified for publication in the Official Reports. For good cause and pursuant to California Rules of Court, rule 8.1105, it now appears that the opinion should be published in the Official Reports, and it is so ordered.


Dated: _____          _____

                                                          Richman, Acting P.J.

Trial Court:  Superior Court of San Francisco

Trial Judge:  Hon. Garrett L.Wong


| Attorneys for Appellants | Law Offices of Donald B. Mooney |
| | Donald B. Mooney |

Attorneys for Appellants    Law Offices of Donald B. Mooney
                            Donald B. Mooney


Attorneys for Respondent     Remy Moose Manley, LLP
Judicial Council of Calif.    Andrea K. Leisy
                             Laura M. Harris


Attorneys for Respondent     Deputy County Counsel
County of Eldorado           County of Eldorado
                             Michael J. Ciccozzi
                             Janeth D. San Pedro


A149501, *Placerville Historic Preservation League v. County of El Dorado*