Filed 10/8/13  Certified for publication 11/6/13 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| SOUTH COUNTY CITIZENS FOR SMART GROWTH,<br><br>   Plaintiff and Appellant,<br><br> v.<br><br>COUNTY OF NEVADA et al.,<br><br>   Defendants and Respondents;<br><br>KKP LAKE OF THE PINES, LLC,<br><br>   Real Party in Interest and Respondent. | C067764<br><br>(Super. Ct. No. 75402) |

Petitioner South County Citizens for Smart Growth (Smart Growth) appeals from the trial court's denial of its petition for writ of mandate in which Smart Growth alleged that the County of Nevada (the County) violated various provisions of the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) in approving

a commercial real estate project in Nevada County.[1]  Smart Growth contends we must reverse the judgment because (1) the County failed to prepare and recirculate a revised draft EIR adding an alternative project proposal recommended by staff for the Nevada County Planning Commission (the staff alternative); (2) the County failed to make any findings regarding the feasibility of the staff alternative; and (3) the County relied on future traffic improvements that have not been approved yet in order to declare the revised project's traffic impacts less than significant.

We conclude (1) the County did nor err in failing to prepare and recirculate a revised draft EIR adding the staff alternative, because the staff alternative was not "significant new information" within the meaning of the CEQA Guidelines; (2) the County was not required to make findings regarding the feasibility of the staff alternative because the alternative was proffered after preparation of the final EIR and adequate alternatives were discussed in the EIR; and (3) the County did not rely on future traffic improvements, but instead relied on the current actual use of the road in question, rather than its current traffic designation.

We will affirm the judgment.

BACKGROUND

This appeal arises from the County's decision to approve the Higgins Marketplace Project (the project) in southwestern Nevada County.  Real Party in Interest Katz Kirkpatrick Properties (KKP) submitted the application for the project to the County in 2005.  The 20.07 acre site consisted of one parcel owned by the Tintle family, but KKP had an option to purchase the northern portion of the site.  The original proposal involved

---

[1] Undesignated statutory references are to the Public Resources Code.  All references to Guidelines are to the CEQA Guidelines, which implement the provisions of CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.)  These guidelines are binding upon all state and local agencies in applying CEQA. (*Schellinger Brothers v. City of Sebastopol* (2009) 179 Cal.App.4th 1245, 1256, fn. 12.)

2

subdivision of the site into 10 parcels for commercial, light industrial, and office uses. On five of the parcels (approximately 10.58 acres), the proposal called for a 59,800 square-foot retail store (expected to be a Bel-Air Market), two retail buildings (one 13,200 square feet and the other 6,500 square feet), two 3,500 square-foot drive-through fast-food restaurants, and 482 parking stalls. No development was proposed for four other parcels (approximately 5.07 acres), which would continue to be owned by the Tintle family, although the proposal allowed for future development of approximately 42,000 square feet of light industrial and office spaces. The last parcel, which was around 3.26 acres, was designated to retain existing wetlands and to provide a 25-foot buffer between the developed parcels and the onsite wetlands. The proposal also included a proposed habitat management plan, as required by the County Code because the wetland buffer was less than 100 feet.

In November 2007, the County published a draft environmental impact report (draft EIR) analyzing the project's potential significant impacts on the environment, and identifying potentially feasible mitigation measures and alternatives that would minimize or avoid potential significant impacts. The draft EIR identified two significant traffic impacts and one significant cumulative air quality impact that could not be reduced to less than significant levels even with the implementation of the mitigation measures identified in the draft EIR. All other potentially significant impacts would be reduced to less than significant levels with the implementation of mitigation measures.

In January 2008, the Nevada County Planning Commission (Planning Commission) held a public hearing to receive comments on the draft EIR. At the request of members of the public, the Planning Commission extended the public comment period. During the extended comment period, KKP submitted a letter that included a peer review of the draft EIR's traffic analysis and a proposal to reduce the size of the Bel-Air to help reduce the project's traffic impacts. At the request of KKP, Pitney Bowes Map Info submitted a letter updating the distribution of projected patrons to the project site, which

3

could influence traffic patterns. The Planning Commission extended the public comment period again until February 29, 2008, to give the public the opportunity to comment on KKP's additional submissions.

The County's environmental consultant prepared responses to the written and oral comments received at the hearing on the draft EIR. The final EIR -- which consisted of the draft EIR, the responses to comments, and associated appendices -- was released for public review on October 30, 2008. Following release of the final EIR, but prior to the Planning Commission's hearing on the document, four more comment letters were received, including a letter from Smart Growth's counsel. The County's environmental consultant prepared responses to the late comments, and the County included the late comments and the responses in an appendix to the final EIR.

On January 8, 2009, the Planning Commission held a hearing on the final EIR to consider whether to recommend that the Nevada County Board of Supervisors (the Board) (1) certify the final EIR, and (2) approve the legislative actions required for the project (including the general plan amendment and rezone). The staff report prepared for the Planning Commission hearing recommended that the Planning Commission vote to recommend that the Board approve a modified version of the project, the staff alternative, in order to address concerns over the project's air quality and traffic impacts. The staff alternative built upon alternative 4 in the draft EIR (the "Redesign/Reduced Density" alternative), which provided for a reduction in overall retail development. The staff alternative would cap commercial property at 75,000 square feet, have 10 acres of open space, increase the wetland buffer from 25 to 100 feet, and prohibit fast food restaurants due to their high traffic generation. The Planning Commission voted three to two to recommend that the Board approve the staff alternative, and the Planning Commission unanimously voted to recommend that the Board certify the final EIR.

Thereafter, KKP worked to address the Planning Commission's concerns and revise the project based on the Planning Commission's recommendations. KKP

4

submitted two alternatives that would reduce the project's footprint and eliminate fast food restaurants. The overall number of proposed buildings was reduced from five to four, and the total square footage was reduced from 86,500 square feet to 75,710 square feet. KKP's first alternative included a 100-foot setback from the onsite wetlands, but would reduce landscaping and cause parking space conflicts with the major interior circulation routes. KKP's second alternative included a 50-foot nondisturbance setback from the wetland area, with a 20-foot buffer zone and greater landscaping. Planning Commission staff conferred with a biological consultant concerning the setback and buffer, concluded that KKP's second alternative was preferable, and recommended to the Planning Commission that it recommend KKP's second alternative to the Board.

The primary differences between the staff alternative and KKP's second alternative were that in KKP's second alternative (1) the Tintle family property was allowed to keep its existing business park designation on 3.03 acres and the proposed office professional designation on 0.78 acres; (2) the wetland setback would be 50 feet rather than 100 feet, but an additional 20 feet was added as a buffer, making the overall reduction to the setback only 30 feet; (3) the total square footage of community commercial designations was increased from 75,000 square feet to 75,800 square feet; and (4) open space was reduced by approximately four acres.[2]

Consistent with the staff recommendation of KKP's second alternative (hereafter also referenced as the revised project), the proposed tentative parcel map was modified to coincide with the new site plan, with seven parcels divided as follows: one for each building, one for the wetlands/open space parcel, and two for the Tintle property parcels, which the Tintles intended to retain after the sale to KKP. In response to objections from

---

[2] There was a dispute concerning whether it was appropriate to designate roads as open space. The staff alternative included roads as open space but KKP's second alternative did not.

the Tintles, the revised project would continue to allow the future development of their parcels for commercial uses as permitted by existing zoning standards. However, development would be limited to 26,000 square feet of building space.

On May 28, 2009, the Planning Commission held a meeting to consider (1) the details of the revised project, and (2) whether to recommend that the Board certify the final EIR. Due to a procedural error in noticing the meeting, the Planning Commission did not discuss the details of the revised project at that time. Instead, it voted five to zero that the final EIR adequately encompassed the revised project, and it recommended that the Board certify the final EIR. However, on June 11, 2009, the Planning Commission met again and discussed the details of the revised project. The Planning Commission voted to recommend that the Board approve the revised project (KKP's second alternative) rather than the staff alternative, and that the Board approve the legislative actions associated with the revised project.

On July 7, 2009, the Board held a public hearing to consider the final EIR, and whether to approve the associated legislative actions. Smart Growth's attorney submitted a lengthy comment letter on the final EIR at the beginning of the hearing. To allow time to consider the letter, the Board continued the meeting until mid-August. In light of the lengthy comment letter and other letters that were received, additional responses to comments were prepared and incorporated into the final EIR.

On August 18, 2009, the Board held two public hearings: one to consider the final EIR and the other to consider the legislative actions. The Board voted to certify the final EIR and approve the legislative actions.

Smart Growth timely filed a petition for writ of mandate in superior court. As relevant to the present appeal, Smart Growth asserted in a second amended petition that the County violated CEQA by (1) failing to prepare and recirculate a revised draft EIR with the staff alternative, which was a potentially feasible alternative and would have less impact on the environment than the revised project; (2) failing to make any findings or

6

otherwise cite to substantial evidence explaining why the staff alternative should not or could not be approved; (3) asserting that traffic impacts were mitigated to "less than significant" levels by administratively redesignating an affected road as a minor arterial without any change to actual traffic conditions on the impacted road; and (4) finding that the revised project's impacts on traffic conditions would be less than significant. After reviewing the administrative record, the trial court rejected these contentions and denied the petition for writ of mandate.

STANDARD OF REVIEW

Section 21168.5 provides that a court's inquiry in an action to set aside an agency's decision under CEQA "shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." The Guidelines define "substantial evidence" as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).)

" 'The court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document.' [Citation.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392, 407 (*Laurel Heights I*).) "We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 (*Goleta II*).) Furthermore, "[t]he appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 (*Vineyard Area Citizens*).)

7

DISCUSSION

I

Smart Growth contends the County violated CEQA's mandatory procedures by failing to prepare and recirculate a revised draft EIR with the staff alternative. Before addressing this contention, it will be helpful to set forth the relevant CEQA framework and address the difference between (1) the determination, during the scoping process, of whether to include alternative projects in the draft EIR and the adequacy of the chosen alternatives, and (2) the determination of whether to recirculate an EIR when significant new information is added concerning a feasible project alternative.

A

"The core of an EIR is the mitigation and alternatives sections. The Legislature has declared it the policy of the State to 'consider alternatives to proposed actions affecting the environment.' [Citations.] . . . [¶] In determining the nature and scope of alternatives to be examined in an EIR, the Legislature has decreed that local agencies shall be guided by the doctrine of 'feasibility.' '[I]t is the policy of the state that public agencies should not approve projects as proposed if there are *feasible alternatives* or *feasible mitigation measures* available which would substantially lessen the significant environmental effects of such projects . . . ." (*Goleta II, supra,* 52 Cal.3d at pp. 564–565, original italics.)

"CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose. . . . [A]n EIR for any project subject to CEQA review must consider a reasonable range of alternatives to the project, *or to the location of the project,* which: (1) offer substantial environmental advantages over the project proposal ([] § 21002); and (2) may be 'feasibly accomplished in a successful manner' considering the economic, environmental, social and technological factors involved." (*Goleta II, supra,* 52 Cal.3d at p. 566, original italics.)

8

The range of alternatives that must be discussed and their level of analysis are subject to a "rule of reason."  (*Laurel Heights I, supra,* 47 Cal.3d at p. 407; Guidelines, § 15126.6, subd. (f) [an EIR must "set forth only those alternatives necessary to permit a reasoned choice"].)  "'Absolute perfection is not required; what is required is the production of information sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned.'  [Citation.]"  (*Village Laguna of Laguna Beach, Inc. v. Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1029 (*Village Laguna*).)  The EIR is not required to set forth every conceivable alternative (*Jones v. Regents of University of California* (2010) 183 Cal.App.4th 818, 826-827), given that in some cases "there are literally thousands of 'reasonable alternatives' to the proposed project."  (*Village Laguna, supra*, 134 Cal.App.3d at p. 1028.)

The scoping process is the screening process by which a local agency makes its "initial determination as to which alternatives are feasible and merit in-depth consideration, and which do not."  (*Goleta II, supra,* 52 Cal.3d at p. 569; see Guidelines § 15083.)  It involves "consult[ation] directly with any person or organization [the lead agency] believes will be concerned with the environmental effects of the project" in hopes of "solv[ing] many potential problems that would arise in more serious forms later in the review process."  (Guidelines, § 15083.)  It takes place after notice of preparation has been sent out and prior to completion of the draft EIR.  (*Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 917, fn. 5; Guidelines § 15083.)

The determination of whether to include an alternative during the scoping process is whether the alternative is *potentially* feasible (*Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 489 (*Mira Mar*)), and the EIR "is required to make an in-depth discussion of those alternatives identified as at least potentially feasible."  (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1504, fn. 5, italics omitted.)  Differing factors come into play when the final decision on project

9

approval is made; at that juncture the decisionmaking body evaluates whether the alternatives are *actually* feasible.  (Guidelines, § 15091, subd. (a)(3).)  "[T]he decision makers may reject as infeasible alternatives that were identified in the EIR as potentially feasible."  (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 981.)

The feasibility of a new alternative proffered after the scoping process, and after the draft EIR is circulated, is one of the factors to be considered in determining whether to recirculate an EIR, but not the only factor.  (Guidelines, § 15088.5, subd. (a)(3).)  According to CEQA, recirculation is required only when significant new information is added to the EIR after public notice is given of the availability of the draft EIR for public review but before certification.  (§ 21092.1; Guidelines, § 15088.5, subd. (a).)  "New information added to an EIR is not 'significant' unless the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement.  'Significant new information' requiring recirculation include, for example, a disclosure showing that:  [¶] . . . [¶] (3) A feasible project alternative or mitigation measure considerably different from others previously analyzed would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it."  (Guidelines, § 15088.5, subd. (a)(3).)

In other words, recirculation is not required simply because new information is added.  As the California Supreme Court observed in *Laurel Heights Improvement Assn. v. Regents of University of California*  (1993) 6 Cal.4th 1112 (*Laurel Heights II*), "the final EIR will almost always contain information not included in the draft EIR" given the CEQA statutory requirements of circulation of the draft EIR, public comment, and response to these comments prior to certification of the final EIR.  (*Id.* at p. 1124.)  But

10

"[r]ecirculation was intended to be an exception, rather than the general rule." (*Id*. at p. 1132.)

An express finding is not required on whether new information is significant; it is implied from the agency's decision to certify the EIR without recirculating it. (*Laurel Heights II, supra*, 6 Cal.4th at p. 1133 ["CEQA does not require an express order or finding on the subject of whether to recirculate a final EIR"]; *Western Placer Citizens for an Agricultural & Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 904 (*Western Placer Citizens*) [a written finding is not required; "[b]y certifying the [final EIR], the Board necessarily concluded the new information did not require recirculation and additional public comment"].) Furthermore, "all new information occurring after release of the final EIR but prior to certification and project adoption need not be included in the EIR before the agency determines whether the new information is significant so as to trigger revision and recirculation." (*Western Placer Citizens, supra,* 144 Cal.App.4th at p. 902.)

B

After the final EIR had been circulated, the Planning Commission voted to recommend that the Board certify the final EIR and approve the staff alternative. Thereafter, however, KKP submitted its second alternative addressing some of the Planning Commission's concerns; KKP's second alternative was recommended by Planning Commission staff and the Planning Commission as the revised project; and the Board ultimately approved the revised project.

Under its first argument heading, Smart Growth does not challenge the adequacy of the various alternatives that were included and discussed in the draft EIR as a result of the scoping process. Nor does Smart Growth challenge the County's failure to recirculate

11

the final EIR with a discussion of the revised project.[3]  Rather, the only challenge Smart Growth raises is that when the Planning Commission initially voted to approve the staff alternative, and before the Planning Commission recommended KKP's second alternative as the revised project, the County should have prepared and recirculated a revised draft EIR with the staff alternative.  Smart Growth argues that because the County did not do so, the public was deprived of the opportunity to comment on a feasible alternative in violation of CEQA's mandatory disclosure procedures.  Smart Growth further contends that because the County failed to proceed in the manner required by law, the applicable standard of review is abuse of discretion.

Smart Growth does not identify any CEQA statute, guideline or judicial decision mandating that where an EIR includes a reasonable range of alternatives, then any additional alternative, even if proffered after the final EIR is released, must be added to the EIR or else the agency will not have proceeded in a manner required by law and will have violated CEQA's disclosure requirements.  As we explained above, "all new information occurring after release of the final EIR but prior to certification and project adoption need not be included in the EIR before the agency determines whether the new information is significant so as to trigger revision and recirculation."  (*Western Placer Citizens, supra,* 144 Cal.App.4th at p. 902.)  Moreover, the failure to recirculate the final EIR is not a failure to proceed in the manner required by law unless the staff alternative meets the factual definition of " 'significant new information.' "  (Guidelines, § 15088.5, subd. (a)(3).)  A determination whether new information is " 'significant' " so as to warrant recirculation is reviewed only for support by substantial evidence.  (*Vineyard*

---

[3]  An appellate contention may be deemed forfeited if it is not presented under an appropriate heading showing the nature of the question presented and the point to be made.  (*Placer Ranch Partners v. County of Placer* (2001) 91 Cal.App.4th 1336, 1343, fn. 9; *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4.)

*Area Citizens, supra,* 40 Cal.4th at p. 447; *Laurel Heights II, supra*, 6 Cal.4th at p. 1135.) Substantial evidence means "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).)

Smart Growth bears the burden of proving a double negative, that the County's decision not to revise and recirculate the final EIR is not supported by substantial evidence. (*Western Placer Citizens, supra,* 144 Cal.App.4th at p. 903; *Sierra Club v. County of Napa, supra,* 121 Cal.App.4th at p. 1497.) That is, Smart Growth must demonstrate that there is no substantial evidence to support a determination that the staff alternative was not significant new information. (Guidelines, § 15088.5, subd. (a)(3).) For the staff alternative to be significant new information, it must be feasible; it must be considerably different from other alternatives previously analyzed; it must clearly lessen the significant environmental impacts of the proposed project; and the project's proponents must decline to adopt it. (*Ibid.*) Smart Growth has the burden to demonstrate that there is no substantial evidence to support a negative finding on any of these factors in order to establish that the County abused its discretion in failing to recirculate the EIR.

"As with all substantial evidence challenges, an appellant challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal. A reviewing court will not independently review the record to make up for appellant's failure to carry his burden. [Citation.]" (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1265-1266.)

Smart Growth has not met its appellate burden. For example, Smart Growth does not demonstrate that there is no substantial evidence to support a determination that the staff alternative was not considerably different than all of the others in the EIR, which analyzed four alternatives to the project.

Alternative 1 was the "No Project" alternative required by CEQA. (Guidelines, § 15126.6, subd. (e).) In that alternative the site would be left in its current condition.

13

Alternative 2, the "Woodridge Court Right-In, Right Out" alternative, provided for restricted "right-in and right-out" access to the project from Woodridge Court. This alternative was selected to determine whether restricted access would avoid traffic impacts to State Route 49.

Alternative 3, the "Business Park Land Use" alternative, would develop the project under the current general plan land use designations. This alternative was designed to reduce traffic and noise impacts to nearby residences.

Alternative 4, the "Redesign/Reduced Density" alternative, would develop the site with commercial uses similar to those of the proposed project. However, it would remove Parcel 3 (a 6,500 square-foot commercial building and associated improvements) in order to accommodate a 50-foot buffer between the wetland conservation area, and it would relocate the drive-through restaurants and commercial building so as to provide a greater buffer between the uses and adjacent residential areas. This alternative was designed to reduce biological, noise, visual and traffic impacts.

Smart Growth argues that the staff alternative "is considerably different" from the alternatives considered in the draft EIR, because none of the draft EIR's alternatives "meet the project's stated objectives by providing for the development of a full-service shopping alternative that would improve the County's jobs/housing balance, while simultaneously reducing the Project's acknowledged 'significant and unavoidable' cumulative air quality impacts by designating the remainder of the project site as Open Space." (Emphasis omitted.) Smart Growth claims that none of the alternatives presented during the County's administrative consideration of the project "contemplates this potentially feasible way to reduce the project's air quality impacts. Rather, every action alternative considered in the publicly circulated Draft EIR reserves a substantial portion of the project site for future, business park and office uses (which are not among the Draft EIR's stated Project objectives), which necessarily include these land uses'

14

attendant incremental future contributions to cumulative air quality impacts." (Emphasis and fn. omitted.)

In other words, the staff alternative allows for more open space. But Smart Growth fails to explain, with reasoned analysis supported by citations to the evidence in the record, why this specific increase in open space is considerably different. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1245, fn. 14 [the failure to present argument with references to the record and citation to legal authority results in a forfeiture of any assertion that could have been raised]; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 [when an appellant fails to raise a point, or fails to support a point with reasoned argument and citations to authority, it is forfeited].) Moreover, Smart Growth does not meet its appellate burden of setting forth all the evidence favorable to the County and showing wherein it is lacking. This is fatal to its claim. (*Defend the Bay v. City of Irvine, supra,* 119 Cal.App.4th at pp. 1265-1266.) Although Smart Growth attempts to rectify its error in its reply brief, it is too late to do so there because it deprives the respondent of the opportunity to respond. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764-765; *American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453.)

These same flaws undermine Smart Growth's attempt to address the other factors in Guidelines section 15088.5, subdivision (a)(3). For example, in its opening brief, Smart Growth maintains that the staff alternative is feasible, but Smart Growth does not refer us to the statutory definition of the term or address the factors set forth in that definition by citation to evidence in the record. (See § 21061.1; Guidelines, § 15364.)[4] Smart Growth does not provide any analysis justifying its position that only potential

---

[4] " 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1; Guidelines, § 15364.)

15

feasibility, as opposed to actual feasibility, is required at this late stage of the CEQA process, under circumstances where there is no claim that the draft EIR lacked adequate reasonable alternatives, the draft EIR had been circulated for public discussion, and the staff alternative was not raised until after the final EIR was submitted for certification.

With respect to another recirculation factor, Smart Growth simply asserts that the staff alternative will "clearly lessen the significant environmental impacts of the [proposed] project" (Guidelines, § 15088.5, subd. (a)(3)) by designating four acres as open space on the Tintle property, rather than permitting future business park and professional use, and by eliminating the fast food restaurants. Smart Growth provides no analysis, supported by citations to evidence in the record, explaining how this will clearly lessen the project's environmental impacts. For example, the reduction in cumulative air quality environmental impacts might be insignificant when viewed under the appropriate thresholds for Nevada County. Moreover, Smart Growth fails to show that the staff alternative clearly lessens the significant environmental impacts of the revised project; instead, Smart Growth compares the staff alternative to the project as originally proposed.

We are not required to cull through the more than 11,000-page administrative record to see if there is support for Smart Growth's position. (*Defend the Bay v. City of Irvine, supra,* 119 Cal.App.4th at pp. 1265-1266.) Under the circumstances, Smart Growth has not established its claim that the County abused its discretion in failing to prepare and recirculate a revised draft EIR with the staff alternative.

II

In a related contention, Smart Growth claims the County violated CEQA's mandatory procedures by failing to make findings regarding the feasibility of the staff alternative. Smart Growth believes that once the Planning Commission found the staff alternative sufficiently feasible to recommend approval of the alternative to the Board, the Board had to either adopt the staff alternative or make findings setting forth the reasons why the staff alternative was not feasible. Smart Growth argues that because the

16

Board did not adopt the staff alternative, it had to make findings regarding the feasibility of that alternative.

Although a lead agency must give reasons for rejecting an alternative as infeasible during the scoping process (Guidelines, § 15126.6, subd. (c)),[5] the scoping process takes place prior to completion of the draft EIR. (*Gilroy Citizens for Responsible Planning v. City of Gilroy, supra,* 140 Cal.App.4th at p. 917, fn. 5; Guidelines, § 15083.) The staff alternative was proposed well after completion of the draft EIR; indeed, it was proffered after preparation of the final EIR.

Furthermore, although the lead agency must give reasons for rejecting the alternatives discussed in the EIR where the document identifies one or more significant environmental effects of the project (§ 21081, subd. (a)(3); Guidelines, § 15091, subd. (a)(3)), the staff alternative was not one of the alternatives discussed in the EIR and Smart Growth has not established that the County erred by not including it in the EIR.

Smart Growth does not point to any CEQA statutes or regulations requiring that the lead agency make findings regarding why it rejected an alternative proposed after the final EIR and not included in the EIR. (*South Orange County Wastewater Authority v. City of Dana Point* (2011) 196 Cal.App.4th 1604, 1617 ["The Legislature has expressly

---

**5** Guidelines section 15126.6, subdivision (c) states: "Selection of a range of reasonable alternatives. The range of potential alternatives to the proposed project shall include those that could feasibly accomplish most of the basic objectives of the project and could avoid or substantially lessen one or more of the significant effects. The EIR should briefly describe the rationale for selecting the alternatives to be discussed. The EIR should also identify any alternatives that were considered by the lead agency but were rejected as infeasible during the scoping process and briefly explain the reasons underlying the lead agency's determination. Additional information explaining the choice of alternatives may be included in the administrative record. Among the factors that may be used to eliminate alternatives from detailed consideration in an EIR are: (i) failure to meet most of the basic project objectives, (ii) infeasibility, or (iii) inability to avoid significant environmental impacts."

17

forbidden courts to interpret CEQA or the [CEQA Guidelines] to impose 'procedural or substantive requirements beyond those explicitly stated' in the act or in the guidelines"].) Indeed, as we explained in part I, the County was not required to make an express finding of infeasibility. It was only required to find that the staff alternative was not significant new information, a finding that may be implied from its decision to certify the EIR without recirculating it. (*Laurel Heights II, supra*, 6 Cal.4th at p. 1133; *Western Placer Citizens, supra,* 144 Cal.App.4th at p. 904.) Feasibility was just one of the factors to be considered in determining whether the staff alternative qualified as significant new information.

Smart Growth contends the County's failure to make findings explaining why the staff alternative was infeasible "cannot be squared with" *Laurel Heights I, supra,* 47 Cal.3d 376, and *Goleta II, supra*, 52 Cal.3d 553, but those cases are inapposite.

*Laurel Heights I, supra*, 47 Cal.3d 376 concerned an EIR's inadequate discussion of alternative locations for a project in violation of Guidelines section 15126. The Regents of the University of California merely included a conclusory statement that any alternatives were infeasible without providing supporting analysis. (*Id*. at pp. 403-404.) The California Supreme Court held that the Regents must include their analytic route so that the public can be fully informed, rather than simply expecting the public to trust them. (*Id*. at pp. 404-405.) But here, adequate alternatives were discussed in the EIR. *Laurel Heights I* has no bearing on the present claim that the County had an obligation under CEQA to issue a finding of infeasibility if it chose not to recirculate the EIR with the staff alternative.

*Goleta II, supra*, 52 Cal.3d 553 arose following a first appeal in which the County's EIR was held to be inadequate because it failed to discuss any alternative project sites. (*Citizens of Goleta Valley v. Board of Supervisors* (1988) 197 Cal.App.3d 1167, 1180 (*Goleta I*).) During the pendency of the appeal in *Goleta I*, the county began preparation of a supplemental EIR which contained a discussion of only one alternative

18

site.  (*Goleta II, supra*, 52 Cal.3d at p. 560-561.)  A citizens group, CGV, belatedly requested consideration of a number of additional sites.  (*Id*. at p. 562.)  The board of supervisors concluded none of the alternative sites were feasible and issued 10 pages of findings concerning those alternative sites, but a discussion of the additional alternatives was not included in the EIR.  (*Id*. at pp. 562, 567-570.)  The Court of Appeal concluded that the EIR failed to delineate facts sufficient to explain its rejection of alternative sites other than the single alternative discussed in the EIR.  (*Id*. at p. 563.)

The California Supreme Court reversed the Court of Appeal, holding that it was reasonable to explain why the alternative sites were rejected via administrative findings, rather than in the EIR, due to the belated manner in which the sites were brought to County's attention.  (*Goleta II, supra,* 52 Cal.3d at pp. 567-570.)  The Supreme Court stated:  "In general, an EIR should set forth the alternatives that were considered by the lead agency and rejected as infeasible during the scoping process, and the reasons underlying the agency's determination.  [Citation.]  However, the administrative record may be studied 'to assess the degree of discussion any particular alternative deserves, based on the alternative's feasibility and the stage in the decisionmaking process it is brought to the attention of the agency.'  [Citation.]  To be sure, agency consideration of otherwise reasonable alternatives in the administrative record cannot replace the CEQA mandated discussion of alternatives in the EIR.  [Citations.]  'But where potential alternatives are not discussed in detail in the [EIR] because they are not feasible, the evidence of infeasibility need not be found within the [EIR] itself.  Rather a court may look at the administrative record as a whole to see whether an alternative deserved greater attention in the [EIR].'  [Citations.]"  (*Id.* at p. 569.)

"Thus, where the circumstances warrant, a reviewing court may consult the administrative record to assess the sufficiency of the range of alternatives discussed in an EIR.  The circumstances justify such consultation here.  Unlike the EIR in [*Laurel Heights I*], County's environmental review of the [] project discussed a full range of

alternatives, including an in-depth discussion of one off-site alternative. Moreover, CGV raised the issue well after the comment period had expired. Thus, the Board's decision to delineate its reasons for rejecting the CGV sites as feasible alternatives by means of administrative findings, rather than a full-blown supplemental EIR, cannot be deemed in this case to have been erroneous." (*Goleta II, supra*, 52 Cal.3d at pp. 569-570.)

The procedural history of the case and the Supreme Court's analysis demonstrates that *Goleta II* concerned the adequacy of the required reasonable range of alternatives in the EIR. It stated an exception to the general rule that the reasons for rejecting project alternatives as infeasible must be discussed in the EIR. (*Laurel Heights I, supra*, 47 Cal.3d at pp. 404-405; Guideline, § 15126.) *Goleta II* has no application to the present case because Smart Growth has not challenged the adequacy of the EIR on the ground it lacks a reasonable range of alternatives. Thus, we must presume the EIR provided the Board with enough information to make an informed decision. (*Village Laguna, supra*, 134 Cal.App.3d at p. 1029.) *Goleta II* does not hold that when an EIR includes a reasonable range of alternatives, but the County's staff suggests an additional alternative that is then revised by the project applicant, the County must make an express finding that the staff proposal is infeasible before it can approve the revised project. Under the circumstances, Smart Growth's contention lacks merit.

III

Smart Growth next contends the County violated CEQA by relying on future traffic improvements that have not been approved yet in order to declare the revised project's traffic impacts less than significant.

If it is feasible to do so, a public agency must mitigate or avoid the significant environmental effects of a project that it carries out or approves. (§ 21002.1, subd. (b); *City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 359.) "CEQA requires the appropriate public agency 'to find, based on substantial evidence, that the mitigation measures are "required in, or incorporated into, the project";

20

or that the measures are the responsibility of another agency and have been, or can and should be, adopted by the other agency; or that mitigation is infeasible and overriding considerations outweigh the significant environmental effects. ([Pub. Resources Code,] § 21081; Guidelines, § 15091, subd. (b).) In addition, the agency "shall provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or other measures" ([Pub. Resources Code,] § 21081.6, subd. (b)), and must adopt a monitoring program to ensure that the mitigation measures are implemented (§ 21081.6, subd. (a)). The purpose of these requirements is to ensure that feasible mitigation measures will actually be implemented as a condition of development, and not merely adopted and then neglected or disregarded.' [Citation.]" (*Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018, 1035; italics omitted.)

Smart Growth contends the County relied on uncertain future traffic improvements in order to declare the project's level of service (LOS) impact on Combie Road to be less than significant. Smart Growth states that KKP submitted a revised traffic study indicating that the revised project would cause Combie Road, between Higgins Road and State Route 49, to drop to LOS F under its existing designation as a "major collector." LOS F is the worst level of traffic flow.[6] Smart Growth believes the County assumed this impact would be reduced to less than significant levels by (1) a future widening of the road, and (2) limiting driveway and side street access along that segment of Combie

---

[6] LOS measures the quality of traffic flow, with a grade of "A" referring to the best conditions, and "F" representing the worst conditions. The Nevada County general plan presents LOS criteria for roadway segments based on daily traffic volumes, and these thresholds make use of classifications that are based on roadway facility type. The higher classifications (i.e., arterial roadways) provide higher degrees of mobility and serve more traffic; the lower classifications (i.e., local roadways and collectors) provide access. For this reason, the County accepts a higher volume of traffic on minor arterials than on major collectors.

21

Road. Smart Growth claims the County violated CEQA because those future changes were not incorporated into the project as enforceable mitigation measures and are not certain to occur. According to Smart Growth, existing conditions near the project may make it infeasible to limit driveway access. As best we can discern, Smart Growth believes that unless the aforementioned future changes occur, Combie Road cannot be redesignated as a minor arterial, and the traffic impacts will not be less than significant.

However, a traffic engineer for the County's traffic consultant indicated that the fact a section of Combie Road near the project has more driveways than other sections of the road must not be taken out of context, and does not dictate the designation of the road. The traffic engineer stated, "It is impractical to consider separate designations of small sections of roadways within larger designated roadway segments. Designating roadways in such a piecemeal manner would defeat the purpose of corridor designations." In other words, the existing driveways on one portion of Combie Road would not preclude a minor arterial designation for the entire roadway.

As for the assumption that a previously planned and funded expansion of Combie Road would occur, the County could make such an assumption without requiring that it occur as a mitigation measure. "A public agency can make reasonable assumptions based on substantial evidence about future conditions without guaranteeing that those assumptions will remain true. [Citations.]" (*Environmental Council of Sacramento v. City of Sacramento, supra*, 142 Cal.App.4th at p. 1036.) Smart Growth may be unhappy with the assumption, but it is not a mitigation measure the County had to ensure would occur. (*Ibid*.)

The trial court concluded, and we agree, that the County did not require the redesignation of Combie Road as a minor arterial as a mitigation measure. The County simply determined that, for purposes of the traffic analysis, Combie Road functioned as a minor arterial because it acts as a thoroughfare between Lake of the Pines and State Route 49. It did not function as a major collector, which allows unlimited driveway

accesses and therefore results in slower conditions.  Indeed, independent of the project, the County submitted a change in designation of Combie Road to Caltrans for use on federal functional class maps, and the impetus to reclassify the road came out of the 1996 general plan.  Accordingly, the conclusion that the revised project would have a less than significant impact on Combie Road between Higgins Road and State Route 49 was based on the road's current function, rather than its designation, and the LOS threshold for minor arterials.  This is not a violation of CEQA.

An EIR's analysis must be based on the actual environment, and "[t]his environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant."  (Guidelines, § 15125, subd. (a); see also *Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 337 [a lead agency's determination of the existing environmental setting is reviewed for substantial evidence]; *Environmental Planning & Information Council v. County of El Dorado* (1982) 131 Cal.App.3d 350, 354-355 [CEQA "has clearly expressed concern with the effects of projects on the actual environment upon which the proposal will operate"]; *City of Carmel-by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229, 246 [effect of project must be analyzed in "relation to real conditions on the ground"].)  Because the County addressed impacts on Combie Road based on existing conditions, rather than on the label attached to them, whether Combie Road functions as a minor arterial is governed by the substantial evidence standard.  (*Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1281, 1294-1295 [rejecting the contention that the "fail[ure] to proceed 'in the manner required by law' " standard applied to an agency's characterization of wetlands based on their function and value, and applying the substantial evidence standard instead]; *Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 104-105 [applying substantial evidence standard to agency's classification of an earthquake fault as inactive].)

23

Smart Growth fails to establish in its opening brief that there is no substantial evidence to support the County's determination that Combie Road functions as a minor arterial. It also fails to dispute the appropriateness of basing the EIR's traffic impact determination on roadway function rather than designation. Although the County intends to widen Combie Road and the project is fully funded, this fact was simply cited in the administrative record as support for the conclusion that Combie Road functions more as a minor arterial than a major collector. But because the road functions as a minor arterial, the project will have a less than significant impact on the road, which is why it was not necessary to condition the project on the road's future expansion. (§§ 21002, 21081; Guidelines, §§ 15002, subd. (a)(3), 15091, subd. (a)(1).)

Under the circumstances, Smart Growth's claim that the County violated mandatory CEQA provisions lacks merit.

### DISPOSITION

The judgment is affirmed.


                                                        MAURO           , J.


We concur:


          RAYE         , P. J.


         ROBIE       , J.

Filed 11/6/13

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----


| | |
|---|---|
| SOUTH COUNTY CITIZENS FOR SMART GROWTH,<br><br>    Plaintiff and Appellant,<br><br>  v.<br><br>COUNTY OF NEVADA et al.,<br><br>    Defendants and Respondents;<br><br>KKP LAKE OF THE PINES, LLC,<br><br>    Real Party in Interest and Respondent. | C067764<br><br>(Super. Ct. No. 75402)<br><br><br>ORDER FOR<br>PUBLICATION |


APPEAL from a judgment of the Superior Court of Nevada County, Robert Tamietti, Judge. Judgment affirmed.

Lippe Gaffney Wagner, Keith G. Wagner, Brian Gaffney, and Erin C. Ganahl for Plaintiff and Appellant.

Alison Barratt-Green, Interim County Counsel, for Respondents and Defendants County of Nevada and Nevada County Board of Supervisors.


1

Remy, Thomas, Moose and Manley, James G. Moose, Tiffany K. Wright and Laura M. Harris for Real Party in Interest and Respondent KKP Lake of the Pines, LCC.

THE COURT:

The opinion in the above entitled matter filed October 8, 2013, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

FOR THE COURT:

<u>            RAYE            </u>, P. J.

<u>            ROBIE           </u>, J.

<u>            MAURO           </u>, J.

2