Filed 11/26/19; Certified for Publication 12/18/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITIZENS FOR POSITIVE GROWTH & PRESERVATION, | C086345 |
| Plaintiff and Appellant, | (Super. Ct. No. 34201580002058CUWMGDS) |
| v. | |
| CITY OF SACRAMENTO et al., | |
| Defendants and Respondents. | |

Defendant the City of Sacramento (City) approved and adopted the 2035 General Plan in March 2015. At the same time, the City certified the environmental impact report (EIR) for the 2035 General Plan in accordance with the California Environmental Quality Act (CEQA; Pub. Resources Code,[1] § 21000 et seq.). Plaintiff Citizens for Positive

---

[1] All further section references are to the Public Resources Code unless otherwise specified.

1

Growth & Preservation (Citizens) filed a petition for writ of mandate and injunctive relief and a complaint for declaratory relief (petition) against the City and its city council seeking to set aside both administrative actions. The trial court denied the petition, upholding both actions; Citizens appeals.

On appeal, Citizens challenges the validity of the 2035 General Plan and the EIR. It contends we should vacate the trial court's ruling regarding the 2035 General Plan and order the City to rescind its approval thereof because a sentence in the introductory paragraph violates and conflicts with state planning laws. It argues we should do the same as to the EIR because the City's analyses pertaining to traffic, greenhouse gas emissions, air quality, cyclist safety, and the "no project" alternative failed to comply with CEQA, and the City was required to recirculate the EIR after releasing substantial supplemental changes shortly before the city council's public hearing.

Finding no merit in Citizens's arguments, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

For the reader's ease, we provide a summary of the general factual and procedural background here and include the pertinent facts as to each issue in the applicable portion of the Discussion.

The City adopted its 2030 General Plan in March 2009. In October 2012, the City initiated a five-year technical update to the 2030 General Plan, culminating in the City's 2035 General Plan. The key changes included updating the planning forecast horizon through 2035 and revising the traffic thresholds of significance standards used in the 2030 General Plan.

The City released its draft 2035 General Plan and draft EIR for public review in August 2014. On January 15, 2015, the planning and design commission voted to forward to the city council a recommendation to certify the EIR and adopt the 2035 General Plan, including five supplemental changes to the draft 2035 General Plan and EIR considered by the commission.

2

On February 24, 2015, the City issued a "special reminder" that the city council would consider adopting the 2035 General Plan and certifying the EIR at a meeting on March 3, 2015.  In the reminder, the City provided a hyperlink to a document containing a "list of supplemental changes to the Draft 2035 General Plan."  The document outlined 13 changes to the draft 2035 General Plan and EIR, including the five changes previously considered by the planning and design commission.

The City approved the 2035 General Plan and certified the EIR with the proposed changes on March 3, 2015.  Citizens filed suit on April 1, 2015.

DISCUSSION

I

*The 2035 General Plan*

Citizens presents a facial challenge to the 2035 General Plan, arguing the introductory paragraph violates Government Code section 65300.5, the Governor's Office of Planning and Research's General Plan Guidelines (General Plan Guidelines),[2] and "state planning laws" because it purports to grant to the City unfettered discretion to "create a hierarchy of General Plan elements, or to approve projects inconsistent with any policy of the General Plan."  Citizens requests we vacate the trial court's ruling and order the City to rescind approval of the 2035 General Plan.

The introductory paragraph provides:  "The City, in its sole discretion, shall determine a proposed project's consistency with the City's General Plan.  Consistency is achieved if a project will further the overall objectives and policies of the General Plan and not obstruct their attainment, recognizing that a proposed project may be consistent with the overall objectives of the General Plan, but not with each and every policy

---

[2]     The pertinent General Plan Guidelines were issued in October 2003.  Although the General Plan Guidelines are advisory, they provide an aid to interpretation.  (*Twain Harte Homeowners Assn. v. County of Tuolumne* (1982) 138 Cal.App.3d 664, 702.)

thereof.  In all instances, in making a determination of consistency, the City may use its discretion to balance and harmonize policies with other complementary or countervailing policies in a manner that best achieves the City's overall goals."  It is the last sentence that contains the language offensive to Citizens.

The City argues the 2035 General Plan comports with governing law because it is internally consistent as written and the introductory paragraph "is consistent with precedent that acknowledges the City's discretion to weigh and balance competing interests in establishing development policies and in applying them."  As we explain, the introductory paragraph does not conflict with or violate governing law and does not render the 2035 General Plan invalid on its face.

A

*General Plan Consistency Requirements Generally*

"A city or county must adopt a 'comprehensive, long-term general plan' for its physical development.  [Citation.]  The general plan must include 'a statement of development policies and . . . objectives, principles, standards, and plan proposals' and elements addressing land use, circulation, housing, conservation, open space, noise, and safety.  [Citation.]  The general plan serves as a 'charter for future development' [citation] embodying fundamental policy decisions [citation].  The policies in a general plan typically reflect a range of competing interests." (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1194.)

The concept of consistency arises in the context of a general plan at two distinct stages.  It first arises when a city adopts a general plan.  Government Code section 65300.5 provides a general plan and each of its elements must "comprise an integrated, internally consistent and compatible statement of policies."  "A general plan is internally inconsistent when one required element impedes or frustrates another element or when one part of an element contradicts another part of the same element.  For example, a land use element calling for substantial increases in population is inconsistent with a

4

circulation element acknowledging that existing roads are inadequate to handle more traffic and offering no practical way to obtain better roads." (*South Orange County Wastewater Authority v. City of Dana Point* (2011) 196 Cal.App.4th 1604, 1619.)

The General Plan Guidelines state "[t]he concept of internal consistency holds that no policy conflicts can exist, either textual or diagrammatic, between the components of an otherwise complete and adequate general plan.  Different policies must be balanced and reconciled within the plan." (General Plan Guidelines, at p. 12.)  Without such consistency, "[d]ecision-makers will face conflicting directives; citizens will be confused about the policies and standards the community has selected; findings of consistency of subordinate land use decisions such as rezonings and subdivisions will be difficult to make; and land owners, business, and industry will be unable to rely on the general plan's stated priorities and standards for their own individual decision-making.  Beyond this, inconsistencies in the general plan can expose the jurisdiction to expensive and lengthy litigation." (*Id*. at p. 13.)

The concept of consistency arises at the second stage when a proposed project is presented for a city's consideration and approval.  "The rule of general plan consistency is that the project must at least be compatible with the objectives and policies of the general plan." (*Naraghi Lakes Neighborhood Preservation Assn. v. City of Modesto* (2016) 1 Cal.App.5th 9, 17, italics omitted.)  " ' "An action, program, or project is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment." ' " (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 817.)

B

*The 2035 General Plan Is Valid On Its Face*

The adoption of a general plan is a legislative act and is presumed valid. (*Federation of Hillside & Canyon Assns. v. City of Los Angeles*, *supra*, 126 Cal.App.4th at p. 1195; Gov. Code, § 65301.5.)  As the parties point out, "[a] petitioner may challenge

5

a general plan on the ground that it does not substantially comply with [the requirements in Government Code sections 65300 to 65307] by way of petition for writ of mandate under Code of Civil Procedure section 1085." (*Federation of Hillside*, at p. 1195; Gov. Code, § 65751.) " 'Substantial compliance . . . means actual compliance in respect to the substance essential to every reasonable objective of the statute,' as distinguished from 'mere technical imperfections of form.' " (*Camp v. Board of Supervisors* (1981) 123 Cal.App.3d 334, 348, italics omitted.)

"Judicial review of a legislative act under Code of Civil Procedure section 1085 is limited to determining whether the public agency's action was arbitrary, capricious, entirely without evidentiary support, or procedurally unfair. [Citations.] A court therefore cannot disturb a general plan based on violation of the internal consistency and correlation requirements unless, based on the evidence before the city council, a reasonable person could not conclude that the plan is internally consistent or correlative." (*Federation of Hillside & Canyon Assns. v. City of Los Angeles*, *supra*, 126 Cal.App.4th at p. 1195.)

The introductory language does not violate Government Code section 65300.5 or the General Plan Guidelines, as Citizens contends. Government Code section 65300.5 and the General Plan Guidelines require the policies in a general plan *as written* to be integrated, internally consistent, and compatible. Citizens points us to no inconsistency between policies in the 2035 General Plan as written and nothing in the introductory language creates an inconsistency between the policies either. The introductory language also says nothing about establishing a hierarchy between the general plan elements. (Cf. *Sierra Club v. Board of Supervisors* (1981) 126 Cal.App.3d 698, 702-703, 708 [a "precedence clause" contained in the land use element of a county's general plan was void where such clause provided that if any conflict existed between the open space and conservation elements of the general plan, the land use element would take precedence].) The language instead concerns the City's *future* determinations of a project's consistency

6

with the general plan, which is a different and separate issue from whether the policies within the general plan are internally consistent with one another as required by Government Code section 65300.5 and the General Plan Guidelines.

Even if the City were to do what Citizens anticipates -- that is, to "create a hierarchy of General Plan elements, or to approve projects inconsistent with any policy of the General Plan" in the future -- it would not render the 2035 General Plan invalid. A finding or determination made separate and independent from the approval of a general plan and not included as part thereof cannot render the general plan internally inconsistent or noncorrelative. (*Federation of Hillside & Canyon Assns. v. City of Los Angeles*, *supra*, 126 Cal.App.4th at p. 1197 [a finding not part of the general plan "cannot make the general plan internally inconsistent or noncorrelative"].) Rather, any such future decision would be subject to an as-applied challenge at the appropriate time.

Citizens's challenge faces another substantial obstacle (not addressed by the parties) because it essentially raises a facial constitutional challenge to the 2035 General Plan[3] on the ground of preemption for conflicting with governing state law. (See *T-Mobile West LLC v. City and County of San Francisco* (2019) 6 Cal.5th 1107, 1116.) This type of challenge is exacting, but it is also the subject of some confusion. As our Supreme Court recently explained: "Some cases have held that legislation is invalid if it conflicts in the generality or great majority of cases. [Citation.] Others have articulated a stricter standard, holding that legislation is invalid only if it presents a total and fatal conflict with applicable constitutional [or statutory] prohibitions." (*Id*. at p. 1117, fn. 6.) Under either standard, however, Citizens's challenge fails.

---

[3] A general plan is local legislation. (Gov. Code, § 65301.5; see *Building Industry Assn. of Central California v. County of Stanislaus* (2010) 190 Cal.App.4th 582, 589-590.)

7

Nothing in the introductory language precludes the City from administering the 2035 General Plan in a lawful and valid manner. Citizens has, therefore, failed to show it is unavoidable the City will approve projects inconsistent with the 2035 General Plan such that the introductory language presents a total and fatal conflict with applicable statutory prohibitions or the conduct is likely to occur in the great majority of cases. Instead, Citizens attempts to use the following hypothetical to support its argument: "[The City] could determine, for example, that even though approval of a new industrial plant would conflict with policies in the General Plan's Environmental Resources element, the plant, nevertheless, could be approved as consistent with policies relating to economic growth." Citizens's musings on future potential actions by the City does not, however, support an invalidation of the 2035 General Plan *on its face*. The City may avoid unlawful project/general plan consistency determinations in the future; we decline to presume the City intends to violate governing law or to consider any hypothetical future noncompliance with the 2035 General Plan because such disputes are not ripe or before us. Accordingly, we affirm the trial court's ruling upholding the 2035 General Plan.

## II

### *The EIR*

### A

### *General CEQA Principles*

" 'The foremost principle under CEQA is that the Legislature intended the act "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." ' [Citations.] 'With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment.' " (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 511.) A project will have a significant effect on the environment if it will cause "a substantial, or potentially

8

substantial, adverse change in" "the physical conditions which exist within the area which will be affected by [the] project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (CEQA Guidelines,[4] §§ 21060.5 [defining "environment"], 21068 [defining "significant effect on the environment"].)

"The basic purpose of an EIR is to 'provide public agencies and the public in general with detailed information about the effect [that] a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' [Citations.] 'Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees.' [Citation.] The EIR 'protects not only the environment but also informed self-government.' [Citation.]

"The standard of review in a CEQA case, as provided in sections 21168.5 and 21005, is abuse of discretion. Section 21168.5 states in part: 'In any action or proceeding . . . to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion.' [Citation.] Our [Supreme Court's] decisions have thus articulated a procedural issues/factual issues dichotomy. '[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual

---

**4**    References to the CEQA Guidelines are to the regulations for the implementation of CEQA codified in title 14, section 15000 et seq. of the California Code of Regulations, which have been developed by the Office of Planning and Research and adopted by the Secretary of the Natural Resources Agency. (§ 21083.)

conclusions unsupported by substantial evidence. [Citation.] Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence and determine who has the better argument." ' " (*Sierra Club v. County of Fresno*, *supra*, 6 Cal.5th at pp. 511-512, fn. omitted.)

B

*The Traffic Analysis Challenge Is Moot*

1

*Factual Background*

The 2035 General Plan's mobility policy M 1.2.2 states the City will generally seek to operate the roadway network at level of service (LOS)[5] D or better for vehicles during typical weekday conditions, including morning and afternoon peak hours. Subdivisions A through D of the policy contain four exceptions to the general policy. Subdivisions A and B provide all streets in the central city community plan area and the priority investment areas[6] may operate at LOS F. Subdivision C identifies 11 roadways

---

[5]     LOS is a way of describing relative traffic congestion on a roadway segment or intersection. It is based on the ratio of traffic volume to capacity, referring to the delay a motorist experiences as traffic becomes congested. (See *Schaeffer Land Trust v. San Jose City Council* (1989) 215 Cal.App.3d 612, 623.) "An LOS can range from A, representing free flow conditions, to F, representing jammed conditions." (*Ibid*.)

[6]     Priority investment areas "are subareas of the city that have been identified in the community plans as important opportunities for future development through infill, reuse, or redevelopment."

that may operate at LOS E and subdivision D identifies 24 roadways that may operate at LOS F. Subdivision E provides: "If maintaining the above LOS standards would, in the City's judgment be infeasible and/or in conflict with the achievement of other goals, LOS E or F conditions may be accepted provided that provisions are made to improve the overall system, promote non-vehicular transportation, and/or implement vehicle trip reduction measures as part of a development project or a city-initiated project. Additionally[,] the City shall not expand the physical capacity of the planned roadway network to accommodate a project beyond that identified in Figure M4 and M4a (2035 General Plan Roadway Classification and Lanes)."

In the EIR, the 2035 General Plan's transportation and circulation impacts were described, in pertinent part, as follows: "Compared to existing conditions, increases in vehicle traffic would occur on the City's roadway network between now and 2035 due to future population and employment growth. . . . The 2035 General Plan transportation conditions are compared to the applicable LOS thresholds to determine the significance of future increases in traffic, accounting for growth between existing and 2035 conditions."

The traffic impacts to roadway segments within the City were analyzed as follows: "The proposed Mobility Element was designed to comply with Policy M 1.2.2 of the General Plan. This policy is the basis for establishing CEQA impact significance thresholds[7] for this EIR. As shown in Exhibit 4.12-3, implementation of the 2035

---

**7**  "A threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant." (CEQA Guidelines, § 15064.7, subd. (a).) "Such thresholds can be drawn from existing environmental standards, such as other statutes or regulations." (*Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1107.)

11

General Plan would result in daily traffic volume increases, which in some cases would reach or exceed capacity (i.e., LOS E or F conditions) on segments of several city roadways . . . . In most cases traffic would increase under 2035 conditions with implementation of the proposed 2035 General Plan compared to existing conditions . . . . Daily traffic volumes in 2035 would result in a high utilization of roadways as indicated by LOS F conditions on multiple roadways within the City, including those previously listed in Policy M 1.2.2 section C. Roadways experiencing LOS E or F under daily conditions would also likely experience similar conditions during peak hours. In all of these cases, the LOS E or F results have been accepted in Policy M 1.2.2. [¶] Although traffic volumes are projected to increase, the application of the new LOS standards identified in proposed Policy M 1.2.2 would mean that implementation of the 2035 General Plan would not result in significant LOS impacts based on the 2035 horizon year analysis. This conclusion is consistent with the increased priority on multi-modal mobility within the city, rather than just automobile delay and travel times. . . . This impact is considered **less than significant**." The City correspondingly concluded no mitigation measures were required.

2

*Why The Challenge Is Moot*

Citizens argues that, by relying on the 2035 General Plan's new LOS thresholds of significance for its finding of a less than significant impact on traffic, the City "avoided studying the significance of traffic impacts degrading to LOS F, did not conclude that such impacts were insignificant based on substantial evidence, and did not adequately analyze alternatives or mitigation measures." At bottom, Citizens's traffic analysis challenge relies on the premise that the 2035 General Plan's impacts on traffic congestion in certain areas of the City constitute significant impacts within the meaning of CEQA, and that the City failed to properly analyze and mitigate such impacts.

12

We requested supplemental briefing from the parties regarding the applicability and impact, if any, of CEQA Guidelines section 15064.3 on this appeal. The section "describes specific considerations for evaluating a project's transportation impacts" and provides that, except for roadway capacity projects, "a project's effect on automobile delay shall not constitute a significant environmental impact." (CEQA Guidelines, § 15064.3, subd. (a).) It further provides that, "[g]enerally, vehicle miles traveled is the most appropriate measure of transportation impacts" and sets forth criteria for analyzing transportation impacts for land use and transportation projects. (*Id.*, subds. (a)-(b).) The regulation was promulgated, in part, pursuant to section 21099 and certified by the Secretary of the Natural Resources Agency before being approved by the Office of Administrative Law on December 28, 2018.

CEQA Guidelines section 15064.3 applies "prospectively as described in [CEQA Guidelines] section 15007"; however, "[a] lead agency may elect to be governed by the provisions of this section immediately." (CEQA Guidelines, § 15064.3, subd. (c).) "Beginning on July 1, 2020, the provisions of this section shall apply statewide." (*Ibid.*)

Although CEQA Guidelines section 15064.3 applies prospectively, section 21099, subdivision (b)(2) provides that, "[u]pon certification of the guidelines by the Secretary of the Natural Resources Agency pursuant to this section, automobile delay, as described solely by level of service or similar measures of vehicular capacity or traffic congestion shall not be considered a significant impact on the environment pursuant to this division, except in locations specifically identified in the guidelines, if any." The division referenced in the statute is division 13 on environmental quality, section 21000 et seq. (i.e., CEQA).

The City argues section 21099, subdivision (b)(2) renders Citizens's traffic impacts argument moot because the Secretary of the Natural Resources Agency certified CEQA Guidelines section 15064.3 in late 2018. Citizens in turn argues the regulation is inapplicable because it applies prospectively only and, to the extent it applies, the

13

regulation would support its "argument that the EIR's traffic analysis is legally deficient" because the City did not analyze the 2035 General Plan's traffic impacts under the vehicle miles traveled criteria.

We agree with the City. In mandamus proceedings like this one, "the law to be applied is that which is current at the time of judgment in the appellate court." (*Callie v. Board of Supervisors* (1969) 1 Cal.App.3d 13, 18-19; see also *Fairbank v. City of Mill Valley* (1999) 75 Cal.App.4th 1243, 1255-1257, fn. 12 ["where no vested rights will be impaired, it is appropriate for an appellate court to apply the law in existence at the time of its decision rather than at the time an approval was issued"].) Under section 21099, subdivision (b)(2), existing law is that "automobile delay, as described solely by level of service or similar measures of vehicular capacity or traffic congestion shall not be considered a significant impact on the environment" under CEQA, except for roadway capacity projects. Accordingly, the 2035 General Plan's impacts on LOS (i.e., automobile delay) cannot constitute a significant environmental impact, as Citizens argues, rendering Citizens's traffic impacts argument moot. Further, because CEQA Guidelines section 15064.3 is prospective and does not presently require the City to use the criteria set forth therein, Citizens's argument that the City failed to analyze the 2035 General Plan's traffic impacts under the vehicle miles traveled criteria in the regulation fails as well.

C

*The "No Project" Alternative Analysis Challenge Is Unsupported*

Citizens believes the EIR's alternatives analysis is legally deficient because "the EIR's truncated discussion of alternatives contained no quantified analysis for any of its proposed alternatives, which were dismissed without sufficient consideration." Its

14

argument, however, addresses only the "no project" alternative discussion; we address only the argument presented.**8**

1

*Factual Background*

The "No Project/2030 General Plan Alternative" "assumes development would occur consistent with the existing land use designations in the [C]ity, or those of the existing 2030 General Plan (as currently amended)." The 2030 General Plan and the 2035 General Plan generally have the same project objectives; "however, the . . . 2035 General Plan takes further steps to improve energy efficiency and reduced [greenhouse gas] emissions, as well as re-prioritizing the various modes of transportation to increase the sustainability of the transportation system and promote connectivity."

Because "there [wa]s no difference between the [2030 General Plan and the 2035 General Plan] with respect to the buildout in the respective horizon years (2030 and 2035)," the impacts associated primarily with ground disturbance, conversion or consumption of on-the-ground resources, and demand for services such as public services, utilities, and parks were considered to be similar under the two general plans.

The primary differences between the two general plans were identified as the climate action plan and more aggressive flood protection policies included in the 2035

---

**8** An appellant must direct us to the parts of the record that show the claimed error. "An appellate court is not required to search the record to determine whether or not the record supports appellant['s] claim of error. It is the duty of counsel to refer the reviewing court to the portions of the record which support appellant['s] position." (*Green v. City of Los Angeles* (1974) 40 Cal.App.3d 819, 835.) Under the California Rules of Court, each brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." (Cal. Rules of Court, rule 8.204(a)(1)(C).) "If no citation 'is furnished on a particular point, the court may treat it as [forfeited].' " (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115.)

15

General Plan and the change in traffic LOS standards.  Differences in visual impacts and potential impacts on river crossings were also briefly mentioned.

The discussion regarding the climate action plan provides that "[i]mplementation of the incorporated [climate action plan] policies would increase energy efficiency and decrease [vehicle miles traveled], which would reduce citywide criteria air pollutant and [greenhouse gas] emissions.  Because the No Project/2030 General Plan does not include these policies, the impacts associated with [greenhouse gas] and air quality would be greater than the proposed 2035 General Plan."  The City further explained that the 2030 General Plan "may not be as consistent as the [2035] General Plan with the provisions of Senate Bill (SB) 375 and 743, because the [vehicle miles traveled]-reducing policies from the 2012 [climate action plan] would be omitted" and "the 2030 General Plan's flood protection policies, although effective in 2009 when the plan was adopted, are not currently consistent with SB 5 and the 2012 [Central Valley Flood Protection Plan]."

With respect to the change in traffic LOS standards, the City analyzed the comparative environmental effects, in pertinent part, as follows:  "The current 2030 General Plan includes LOS E standards in multi-modal areas.  The proposed 2035 General Plan provides a LOS 'exemption' (allows LOS F) to the [priority investment areas] and LOS E and F to other specified roadways.  Therefore, the No Project/2030 General Plan would result in greater impacts (i.e., additional exceedances of the City's LOS standard) than the proposed 2035 General Plan.  However, it should be noted that this difference in impact is due only to the change in the standard; the actual physical effect (traffic congestion) would be substantially similar between the No Project/2030 General Plan Alternative and the proposed 2035 General Plan."

The City further explained in the section titled "[m]itigation that would no longer be required":  "The No Project/2030 General Plan Alternative would not eliminate any necessary mitigation measures identified for the proposed 2035 General Plan.  Because the No Project/2030 General Plan Alternative would not result in a change to the traffic

16

LOS standard, it is possible that additional mitigation measures would be necessary on specific roadways to improve LOS." The City then concluded "[t]he No Project/2030 General Plan alternative would not avoid any significant and unavoidable impacts associated with the proposed 2035 General Plan."

In its findings of fact and statement of overriding considerations supporting the resolution approving the EIR, the City found the "no project" alternative infeasible because it would not further the City's objectives of "incorporating the City's [climate action plan] into the policies of the General Plan, further focusing development into the City's core and priority investment areas, and facilitating more sustainable, multi-modal transportation infrastructure." The City further explained that the "no project" alternative "would generally result in greater impacts than the proposed project and would not avoid any significant impacts associated with the project."

2

*"No Project" Alternative Analysis Requirements*

An EIR must discuss the "no project" alternative and its environmental impact and provide sufficient information for meaningful evaluation of the comparative merits of the alternative and the proposed project. (CEQA Guidelines, § 15126.6, subds. (d), (e)(1).) The analysis must include a discussion of the existing environmental conditions "as well as what would be reasonably expected to occur in the foreseeable future if the project were not approved, based on current plans and consistent with available infrastructure and community services." (*Id.*, subd. (e)(2).) The purpose of this requirement is to facilitate a comparison between the environmental advantages and disadvantages of the proposed project and what would result if the project were disapproved. (CEQA Guidelines, §15126.6, subd. (e)(1); *Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 917-918.)

Before a public agency may approve a project for which an EIR identifies a significant environmental impact, the agency must make a finding that "[s]pecific

17

economic, legal, social, technological, or other considerations . . . make infeasible the . . . alternatives identified in the [EIR]." (§ 21081, subd. (a)(3).) Such a finding must be based on "substantial evidence in the record." (§ 21081.5.) "[S]ubstantial evidence includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact." (§ 21080, subd. (e)(1).) According to the CEQA Guidelines, substantial evidence "means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (CEQA Guidelines, § 15384, subd. (a).) In reviewing the record for substantial evidence, we presume the agency's findings are correct and resolve all conflicts and reasonable doubts in favor of the findings. (*Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 881-882.)

## 3

### *Why The Challenge Is Unsupported*

Citizens believes the "no project" alternative analysis relating to traffic impacts was nonsensical, unpersuasive, and speculative. As we can best ascertain, however, Citizens challenges only the City's *rejection* of the "no project" alternative; it does not challenge (with argument and citations to the record) the sufficiency of the City's "no project" discussion or analysis under CEQA Guidelines section 15126.6. (*In re Steiner* (1955) 134 Cal.App.2d 391, 399 ["A point which is merely suggested by appellant's counsel, with no supporting argument or authority, is deemed to be without foundation and requires no discussion"]; *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1245, fn. 14 [the failure to present argument with references to the record and citation to legal authority results in a forfeiture of any assertion that could have been raised]; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 [when an appellant fails to raise a point, or fails to support a point with reasoned argument and citations to authority, it is forfeited].)

18

Citizens asserts: (1) the City's "justification for rejecting the 'no project alternative' . . . by accepting failing traffic conditions" "is nonsensical, as by allowing increased traffic congestion on the City's streets, the 2035 General Plan will undoubtedly cause worsening environmental impacts"; and (2) "[t]he City's purported justification for rejecting the 'no project alternative' is speculative insofar as it relies on the City's unsupported statement that 'it is possible that additional mitigation measures would be necessary [on specific roadways to improve LOS]' " under the 2030 General Plan. (Bolding and italicizing omitted.)[9]

The City counters that the analysis "included both qualitative and quantitative analysis" and the City appropriately adopted and applied the policy decision to modify the LOS standards in mobility policy M 1.2.2. In its supplemental brief, the City further argues that the issue is moot under section 21099, subdivision (b)(2) because " 'traffic congestion' is no longer a measure of environmental impacts." We disagree that the issue is moot, but find no deficiency under CEQA.

Section 21099, subdivision (b)(2) provides only that automobile delay as described by LOS shall not be considered a significant impact on the environment. The "no project" analysis issue does not turn on whether the 2035 General Plan's impacts relating to automobile delay constituted a significant impact on the environment (like the traffic impacts analysis *ante*), but instead turns on whether the City's rejection of the "no project" alternative was supported by substantial evidence. Accordingly, the issue was

---

**9** In its reply brief, Citizens also argues that the analysis did not include "an accurate comparison between the true impacts of the 2035 General Plan and the impacts that would exist under the 'no project alternative' (*i.e.*, under the 2030 General Plan)" because the analysis did not consider the supplemental changes adopted after the City completed its alternatives analysis. "[W]e do not consider points raised for the first time in the reply brief absent a showing of good cause for the failure to present them earlier." (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.)

not rendered moot by the Secretary of the Natural Resources Agency's certification of CEQA Guidelines section 15064.3.

The problem with Citizens's arguments is that the City's "justification for rejecting the 'no project alternative' " was not based on the revised LOS standards in the 2035 General Plan or the statement that " 'it is possible that additional mitigation measures would be necessary [on specific roadways to improve LOS]' " under the 2030 General Plan, as Citizens contends. (Bolding and italicizing omitted.) Rather, the City rejected the alternative as infeasible because the 2030 General Plan failed to further some of the City's objectives, generally resulted in greater impacts,[10] and would not avoid any significant impacts associated with the 2035 General Plan. Citizens fails to advance any argument with citation to the record and appropriate authority to demonstrate that the finding was not based on substantial evidence. Any such argument has, therefore, been forfeited. (*In re Steiner*, *supra*, 134 Cal.App.2d at p. 399; *Nwosu v. Uba*, *supra*, 122 Cal.App.4th at p. 1245, fn. 14; *Badie v. Bank of America*, *supra*, 67 Cal.App.4th at pp. 784-785.)

D

*Recirculation Was Not Required*

Citizens argues the City should have recirculated the EIR after it made the supplemental changes released to the public on February 24, 2015, because four of those changes constituted significant new information. The City disagrees. We conclude recirculation was not required.

---

[10] The EIR provides the 2030 General Plan would result in greater impacts to air quality, land use, greenhouse gas and climate change, and transportation and circulation than the 2035 General Plan.

20

### *When Recirculation Is Required*

An agency must recirculate an EIR when "significant new information is added to an environmental impact report" after the agency has made the draft EIR available for public review and has consulted with other agencies but before the EIR is certified. (§ 21092.1; CEQA Guidelines, § 15088.5, subd. (a).) Recirculation means making the revised EIR available for public review and consulting with the other agencies again before certifying the EIR. (CEQA Guidelines, § 15088.5, subd. (d).) "New information added to an EIR is not 'significant' unless the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement." (*Id.*, subd. (a).)

" 'Significant new information' requiring recirculation include, for example, a disclosure showing that:  [¶]  (1) A new significant environmental impact would result from the project or from a new mitigation measure proposed to be implemented[;]  [¶] (2) A substantial increase in the severity of an environmental impact would result unless mitigation measures are adopted that reduce the impact to a level of insignificance[;]  [¶] (3) A feasible project alternative or mitigation measure considerably different from others previously analyzed would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it[;]  [¶]  (4) The draft EIR was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded."  (CEQA Guidelines, § 15088.5, subd. (a).)

"In other words, recirculation is not required simply because new information is added.  As the California Supreme Court observed in *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112 . . . , 'the final EIR will almost always contain information not included in the draft EIR' given the CEQA

statutory requirements of circulation of the draft EIR, public comment, and response to these comments prior to certification of the final EIR. [Citation.] But '[r]ecirculation was intended to be an exception, rather than the general rule.' " (*South County Citizens for Smart Growth v. County of Nevada* (2013) 221 Cal.App.4th 316, 328.)

We review the City's decision not to recirculate the EIR for substantial evidence, resolving reasonable doubts in favor of the administrative finding and decision. (CEQA Guidelines, § 15088.5, subd. (e); *Laurel Heights Improvement Assn. v. Regents of University of California*, *supra*, 6 Cal.4th at p. 1135.) Substantial evidence means "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (CEQA Guidelines, § 15384, subd. (a).) " 'As with all substantial evidence challenges, an appellant challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal. A reviewing court will not independently review the record to make up for appellant's failure to carry his burden.' " (*South County Citizens for Smart Growth v. County of Nevada*, *supra*, 221 Cal.App.4th at p. 330.)

Citizens bears the burden of proving a double negative, that the City's decision not to recirculate the EIR is not supported by substantial evidence. (*South County Citizens for Smart Growth v. County of Nevada*, *supra*, 221 Cal.App.4th at p. 330.) "That is, [Citizens] must demonstrate that there is no substantial evidence to support a determination that the [changes were] not significant new information." (*Ibid.*)

2

*Why Recirculation Was Not Required*

The supplemental changes Citizens contends required recirculation were: (1) number 7 -- deleting the volume-to-capacity ratios on specific roadways for which LOS F would be allowed in mobility policy M 1.2.2; (2) number 9 -- deleting mobility policy M.1.2.6, which provided "[t]he City shall limit the application of the maximum

22

daily volume/capacity ratios identified in Policy 1.2.2 to development projects requiring a General Plan Amendment"; (3) number 8 -- deleting mobility policy M 1.2.5, which provided, in part, that "[t]o maintain acceptable LOS E or F conditions, the City may require applicable vehicle trip reduction measures and physical improvements that increase transit use, bicycling or walking and traffic operational improvements"; and (4) number 10 -- modifying land use policy LU 4.5.5 regarding connections to transit from requiring new neighborhoods to include transit stops to encouraging such transit stops.

Citizens argues the four changes "create[d] significant new CEQA impacts and significantly worsen[ed] already significant impacts." CEQA Guidelines section 15358 defines "effects" and "impacts" (used synonymously) to include "[d]irect or primary effects which are caused by the project and occur at the same time and place" and "[i]ndirect or secondary effects which are caused by the project and are later in time or farther removed in distance, but are still reasonably foreseeable." Such effects must relate to a physical change in the environment. (CEQA Guidelines, § 15358, subd. (b).)

Citizens fails to show how the elimination of the volume-to-capacity ratios in supplemental changes numbers 7 and 9 resulted in or substantially increased the severity of an environmental impact.[11] Citizens argues the ratio elimination will "further exacerbate already failing traffic conditions" because the ratios established "limits to how congested [the roads] could become." In the absence of the ratios, Citizens argues, the City would allow "unlimited and unmitigated congestion on each of th[e] roadway

---

[11]    The City argues the recirculation challenge relating to these supplemental changes was rendered moot under section 21099, subdivision (b)(2) when the Secretary of the Natural Resources Agency certified CEQA Guidelines section 15064.3. We disagree. The issue does not turn on whether the impacts relating to automobile delay constituted a significant impact on the environment, but instead turns on whether the City's decision not to recirculate the EIR is not supported by substantial evidence.

segments." The problem with Citizens's argument is that the ratios themselves would have no physical impact on the environment because the ratios would not change the amount of traffic that would result from or be caused by the project. Although the volume-to-capacity ratios were deleted in the final EIR, there was no change in the projected *amount of traffic* on the roadway segments between the draft and final EIRs. Thus, there was no new or exacerbated impact.

The ratios would further apply only to future development projects requiring a general plan amendment, and Citizens points us to no evidence in the record that any such projects were being contemplated or considered during the project time frame. (*Stanislaus Natural Heritage Project v. County of Stanislaus* (1996) 48 Cal.App.4th 182, 206 [an agency need not forecast the unforeseeable].) Citizens's belief that the City would allow unlimited and unmitigated congestion is not evidence.

In the chart discussing the supplemental changes, the City wrote: "The changes to Policy 1.2.2 would result in no change in the development assumptions utilized for analysis in the Master EIR, nor would any change in development activity in the Policy Area result. Thus, there would be no change in the physical changes in the environment that could occur as a result of adoption of the 2035 General Plan. [¶] The proposed changes would provide flexibility in the determination of general plan consistency in cases where road improvements to meet LOS goals were found to be infeasible. In such cases, the City could achieve consistency by making a determination of infeasibility, accompanied by a finding that the project had contributed to improvements in the City's overall transportation system." The City further wrote: "Policy 1.2.6 would be deleted because the calculation of volume to capacity ratio for roadways is a technical tool that will be used at project impact level analysis and not at the General Plan Policy level."

Citizens fails to meet its burden of proof; it fails to show substantial evidence does not support the City's determination that the change was not significant information warranting recirculation. (*South County Citizens for Smart Growth v. County of Nevada*,

24

*supra*, 221 Cal.App.4th at p. 330.) The same is true of Citizens's arguments regarding supplemental changes numbers 8 and 10.

Citizens cursorily argues change number 8 would exacerbate failing traffic conditions by deleting language providing for traffic operation improvements,[12] and the modification to land use policy LU 4.5.5 in change number 10 "is sufficiently significant to require recirculation of the EIR." Neither statement is supported with reasoned analysis or citations to evidence in the record. Accordingly, Citizens has forfeited its challenge to those supplemental changes and we see no basis for concluding recirculation of the EIR was required. (*In re Steiner*, *supra*, 134 Cal.App.2d at p. 399; *Nwosu v. Uba*, *supra*, 122 Cal.App.4th at p. 1245, fn. 14; *Badie v. Bank of America*, *supra*, 67 Cal.App.4th at pp. 784-785.)

E

*Citizens Has Not Shown The Greenhouse Gas*

*Emissions And Air Quality Analyses Were Inadequate*

Citizens's argument challenging the greenhouse gas emissions and air quality analyses comprises less than half of a page. First, Citizens argues the City's greenhouse gas emissions and air quality analyses were inadequate because the analyses failed to incorporate or consider the *impacts* from deletion of the volume-to-capacity ratios in supplemental changes numbers 7 and 9. As we explained *ante*, however, the deletion of the volume-to-capacity ratios did not result in environmental impacts.

Second, Citizens states, without explanation, argument, or development, the greenhouse gas emissions analysis was inadequate because it was predicated and

---

[12] The City argues the recirculation challenge relating to this supplemental change was rendered moot under section 21099, subdivision (b)(2) when the Secretary of the Natural Resources Agency certified CEQA Guidelines section 15064.3. We disagree for the same reason discussed in footnote 11.

dependent upon the faulty traffic analysis and "the EIR was required -- but failed -- to include all feasible mitigation measures, and to determine whether the impacts to sensitive receptors will be significant, or can be reduced to less than significant levels." We do not consider Citizens's unsupported and undeveloped arguments.

It is a well-established principle that "an appellant challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal. A reviewing court will not independently review the record to make up for appellant's failure to carry his burden." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266.)

We conclude Citizens has failed to show the greenhouse gas emissions and air quality analyses were inadequate.

F

*Citizens Has Not Shown The Cyclist Safety Analysis Was Inadequate*

Vehicle Code section 21760 generally requires a motorist to maintain at least a three-foot distance from a cyclist when passing. If this distance cannot be maintained, the motorist must slow to a reasonable and prudent speed and pass only when doing so would not endanger the safety of the cyclist. Citizens argues, in less than a page, the EIR failed to account for the three-foot requirement and the "acceptance of failing traffic conditions, when coupled with California's Three-Foot Cyclist law, will further contribute to traffic delays, dangerous cycling conditions, and the overall dysfunction of the City's transportation system." The City responds that its analysis of cyclist safety was sufficient and it was not required to analyze traffic delays or dangerous conditions created by the statute.

To the extent Citizens challenges the sufficiency of the cyclist safety analysis (apart from its assertion that the City should have considered the three-foot rule in its analysis), we decline to consider the argument because Citizens failed to support the argument with reasoned analysis or citations to evidence in the record. (*In re Steiner*,

26

*supra*, 134 Cal.App.2d at p. 399; *Nwosu v. Uba*, *supra*, 122 Cal.App.4th at p. 1245, fn. 14; *Badie v. Bank of America*, *supra*, 67 Cal.App.4th at pp. 784-785.)

Citizens's argument regarding Vehicle Code section 21760 fares no better. The entire argument consists of the following hypothetical: "By way of example, large portions of 'H' Street are less than 32 feet wide 'curb to curb.' [Citation.] A 'bike lane' is striped on both sides of the street. These 'bike lanes' are close to the six-foot width required by state law, leaving a maximum of 10 feet for one lane of cars in each direction. This already tight roadway is made even more dangerous by conflicting parking and cycling needs. The allowed parking completely swallows the bike lane, forcing cyclists into the flow of vehicle traffic that is traveling in the already too-narrow traffic lane. Nevertheless, there is no discussion in the EIR of the Three-Foot Cyclist law, and no analysis of the significant risk to motorists and cyclists that will be caused by the General Plan's Mobility Policy that allows unmitigated LOS F conditions on narrow residential streets."

While personal observations are evidence that may properly be considered in the context of an administrative hearing, " 'in the absence of a specific factual foundation in the record, dire predictions by nonexperts *regarding the consequences of a project* do not constitute substantial evidence.' [Citation.] 'Unsubstantiated opinions, concerns, and suspicions about a project, though sincere and deeply felt, do not rise to the level of substantial evidence . . . .' [Citation.] Thus, 'project opponents must produce . . . evidence, other than their unsubstantiated opinions, that a project *will produce a particular adverse effect*.' " (*Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 274.) Citizens points us to nothing in the record establishing a factual foundation for the claim that the project would cause new or worsened impacts to cyclist safety. We, therefore, conclude Citizens has not shown the analysis was inadequate.

DISPOSITION

We affirm the judgment.  The City shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1)-(2).)


/s/_____
Robie, J.


We concur:


/s/_____
Raye, P. J.


/s/_____
Krause, J.

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| CITIZENS FOR POSITIVE GROWTH & PRESERVATION, <br><br>       Plaintiff and Appellant, <br><br>    v. <br><br> CITY OF SACRAMENTO et al., <br><br>       Defendants and Respondents. | C086345 <br><br> (Super. Ct. No. 34201580002058CUWMGDS) <br><br> ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in the above-entitled matter filed on November 26, 2019, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

BY THE COURT:

 /s/
Raye, P. J.

 /s/
Robie, J.

 /s/
Krause, J.

1

EDITORIALS


APPEAL from a judgment of the Superior Court of Sacramento County, Michael P. Kenny, Judge.  Affirmed.

Brown Rudnick, Stephen R. Cook, Soshana B. Kaiser; Larsen Willis & Woodard and Geoffrey K. Willis for Plaintiff and Appellant.

Susana A. Wood, City Attorney, Brett M. Witter, Senior Deputy City Attorney; Stoel Rives, Timothy M. Taylor, Allison C. Smith, Parissa E. Florez for Defendants and Respondents.